**Debra ALLARD, et al., Plaintiffs,**

v.

**INDIANA BELL TELEPHONE COMPANY, INC.,
Defendant.**

**No. IP 93–1346–C M/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 20, 1998.

---

Mark A. Waterfill, Leagre Chandler & Millard, Indianapolis, IN, David L. Rose, Law Office of David Rose, Washington, DC, C. Warren Holland, Holland & Holland, Indianapolis, IN, for Plaintiffs.

Michael Bergin, Ariane S. Johnson, Locke Reynolds Boyd & Weisell, Indianapolis, IN, for Defendant.

## ORDER ON PENDING MOTIONS

McKINNEY, District Judge.

### I. MOTIONS TO STRIKE

■ Rule 56(e) requires that affidavits supporting or opposing a motion for summary judgment set forth facts that would be admissible in evidence, and show "affirmatively that the affiant is competent to testify to the matters" presented. Fed.R.Civ.P. 56(e). Courts may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. *Id.* Although the evidence presented in opposition to or support of summary judgment does not have to be in admissible form, it must be admissible in content. *See Winskunas v. Birnbaum,* 23 F.3d 1264, 1267–68 (7th Cir.1994) (evidence must be of "evidentiary quality," meaning that a change in form but not in content would make the evidence admissible at trial).

■ Plaintiffs offering scientific or technical evidence have the additional burden of establishing the qualifications of the experts, the reliability of their testimony, and its usefulness to the jury. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 587 n. 10, 113 S.Ct. 2786, 125 L.Ed.2d 469 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). Defendant, Indiana Bell Telephone Company, Inc., ("IBT" or "Indiana Bell"), has moved to strike the testimony of plaintiffs' potential expert witnesses Michael Murphy ("Murphy"), Richard Wertheimer ("Wertheimer"), Marc Bendick ("Bendick"), Lance Seberhagen ("Seberhagen"), and Jeffrey Rasmussen ("Rasmussen"). The Court need not address the motion as it relates to Murphy's testimony, because plaintiffs have indicated they do not intend to call him as an expert, and thus have effectively withdrawn his testimony from contention. *See* Pls.' Brf. In Oppos. To Def.'s Mot. To Str. Exp. Test. at 8, n. 1. In addition, plaintiffs' relatively weak arguments in favor of the relevance and reliability of Rasmussen's report, coupled with Indiana Bell's proffered evidence that he did not actually write this report, renders it untrustworthy and inadmissible as an expert opinion. *See* Rasmussen Dep. at 33, 36–37, 42, 43, 46–47, 52.

■ Even if it did not suffer these defects, Rasmussen's report would not support the contention that Indiana Bell purposely targeted older workers during its 1992 workforce resizing program ("WRP"). The report is based on the assumption that employees who had worked five years or less were completely excluded from the resizing process. The evidence shows otherwise. At most, it shows that these workers were not automatically included in the mechanical phase of the evaluation process. Yet, they were evaluated individually and separately by their supervisors, using the same criteria as the others in phase one. The report's conclusion that younger workers were "protected more from the downsizing process at a probability level of less than 5 times out of a

million," is not trustworthy because its premise is false. Plaintiffs have not offered sufficient evidence to raise a factual issue about whether these employees were excluded, and defendant's evidence to the contrary adequately supports a finding that they were included. Thus, Rasmussen's opinion bears no relationship to a material fact in dispute, for there was ample evidence to show that the alleged "protected" group did not exist. Not only are Rasmussen's methods and assumptions unreliable, but his opinion suffers from irrelevance. For all of these reasons, it must be excluded.

■ The report offered by Seberhagen is the same report as was filed in the related case, *Adams v. Ameritech Services, Inc.*, IP 93–420–C, which the Court found to be inadmissible. It is equally inadmissible here. Seberhagen's testimony about the disparate impact on older workers of use of the criterion "growth potential" during the downsizing is not only irrelevant, in that it relates to a theory of recovery not available under the ADEA, but is also not helpful to the jury. The criterion Seberhagen analyzed was "growth potential, which he construed as being defined by Indiana Bell as 'promotional potential.'" Def.'s App. 3, Seberhagen Rep. at 2. Based on what plaintiffs' counsel had told him, Seberhagen reported that there were no "detailed rating scales, behavioral guidelines, or other written explanations to assist in defining these terms."[1] *Id.* He characterized the term as a "vaguely-defined rating factor," and concluded that its use would produce unreliable measurements. Each rater would have to supply his or her own definition, he opined, meaning that the results would vary depending on the rater. *Id.*

By his own admission, however, Seberhagen was not concerned about how the terms were actually used or applied by either Indiana Bell or Ameritech Services, Inc. ("ASI"). Seberhagen Dep. at 38. Rather, as he understood it, the point of his report was to give his "general professional opinion about the use of growth potential and pro-

motional potential" as described only in the documents he examined. *Id.* Seberhagen examined only the proposed selection process (Pls.' Ex. 1) for Indiana Bell, and did not know which company used, or had access to, which documents. *Id.* Again, he said that did not matter to him. *Id.* In other words, he gave his opinion about the reliability and validity of these terms in the abstract, without reference to the actual evaluation process used by either company. He testified that he only looked at growth potential as the selection procedure, and that it was "a very limited question that I was asked to look at." *Id.* at 109. The evidence shows that many different criteria were used to select the employees for termination, making Seberhagen's view of the facts distorted.

According to Seberhagen, the unreliable scores that would result from use of such vague terms would be invalid in a competitive selection situation, and were likely to have an "adverse impact on older employees." *Id.* at 3. Seberhagen's explanation for the latter conclusion, however, is that the "common stereotype that 'You can't teach an old dog new tricks' could have worked against older employees in the ratings." *Id.* Such obvious speculation by an expert is precisely the type of testimony that should be kept from a jury. Moreover, the likelihood of confusing the jury with testimony by an expert on the meaning of a phrase found in a document, when jurors are capable of discerning that meaning themselves from the context, would be immense. It is also highly prejudicial to allow someone bearing the mantle of "expert" to testify about the meaning or effect of a term, based on so little information about how the term was actually used. For these reasons also, Seberhagen's testimony is irrelevant, unreliable, and not helpful to the factfinder.

Turning to Wertheimer's and Bendick's opinions, the Court finds that, as in the *Adams* case, the defendant here has challenged the validity of the methods used by Wertheimer, the relevance of his opinion to the demonstrable facts of this case, and its

---

1. Plaintiffs' counsel have overstated the facts in this case as they represented those facts to this Court and to their experts. This has not been a helpful practice. It has caused this Court an inordinate amount of time in checking references to the facts and the law.

relative probative value. Because Bendick's report is primarily a vouching statement for Wertheimer's work, its admissibility will depend on whether its antecedent is admissible. Bendick submitted the same report for both cases, in which he described his credentials as a labor economist, with a Ph.D. from the University of Wisconsin. Def.'s App. 5, Bendick Report at 1. He reports spending most of his professional time researching and consulting on employment issues, with a smaller portion of that time devoted to litigation. According to Bendick, his testimony has been accepted in thirteen federal cases and he has assisted in more than seventy-five cases. *Id.* Bendick was asked by plaintiffs' counsel to "consult with another economist, Dr. Richard Wertheimer, while he was producing his analyses in this case; to review and evaluate Dr. Wertheimer's analyses; and to supplement Dr. Wertheimer's work with such additional analyses as [he] judged appropriate." *Id.* Bendick reported that he agrees with Wertheimer's analytical approaches, believes they were "implemented with appropriate professional care," and that they can be relied on as sound. *Id.* at 2. He also agrees with the conclusions that Wertheimer drew from his statistical analyses, especially certain enumerated conclusions.

To supplement the work that Wertheimer performed, Bendick added his opinion about the re-employment prospects for older, former Indiana Bell employees. *Id.* at 5. He began by explaining that the majority of terminated employees who were in their forties and fifties would likely seek re-employment, rather than retire. *Id.* at 6. Bendick illustrated this point using data collected from one terminated worker, Lawrence Shelton, from which he projected that the "vast majority" of Indiana Bell employees age forty and above, who were selected under the resizing plan, would be concerned about whether they could reasonably expect to find a new job. *Id.* at 7. That concern, Bendick opined, would have influenced whether they would "volunteer" to take the early retirement package. *Id.* The point of his analysis

was to discredit the defendant's accounting for the employees who volunteered for early retirement. Based on Bendick's own independent research, and that of others, he predicted that "most such workers [would] face unfavorable labor market circumstances and limited employment opportunities." *Id.* He concluded further that "only a small proportion" of the employees selected for termination at Indiana Bell were likely to have "truly volunteer[ed]" for termination. *Id.* at 11.

Bendick further states that this "line of reasoning" raises "serious questions" about the characterization of Indiana Bell employees who accepted the early retirement package as volunteers. *Id.* He opined that it would be more likely that they accepted the offer "because they believed (perhaps because they have been informed, directly or indirectly, by their employer) that they were about to be involuntarily terminated." *Id.* He found this hypothesis supported by an analysis of the percentage of employees, aged forty or more, who had been selected and who volunteered for termination, with the number of the same population who had not been selected and who had volunteered. The former group was 40%, while the latter was 7%. *Id.* at 12. This analysis, according to Bendick, strengthened Wertheimer's conclusion that it was inappropriate to classify employees who had been selected for termination, yet accepted the early retirement package, as volunteers. *Id.*

Indiana Bell challenges the basis, validity and relevance of Bendick's opinions. Initially, the defendant points out that Bendick stated in his report that he and Wertheimer remained in contact throughout the period in which Wertheimer was producing his analyses, and that they discussed this case. Yet, he has admitted that was not true. *Id.* at 2. During his deposition, Bendick said that he and Wertheimer had only discussed Wertheimer's difficulty reading certain databases for this case, and the remainder of their discussions were about an unrelated case.[2]

2. The Court notes that the other case on which Bendick worked with Wertheimer was *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2nd Cir.1997). In that case, the district court excluded Wertheim-

er's statistical analysis of promotion and termination rates of employees fifty years of age or older at Wyatt. Wertheimer had concluded that employees aged fifty or more were treated differ-

Bendick Dep. at 12–13, 15. He also admitted that he did not read or review Wertheimer's report before it was submitted, so he could not have offered any substantive assistance therewith. Thus, he did not actually "consult" with Wertheimer. Defendant argues that Bendick did not objectively evaluate the Wertheimer report, or provide any reasons for his opinion as to its validity. Instead, he merely agreed with it in its entirety, in effect rubber-stamping it. The defendant also points to Bendick's testimony during his deposition that he did "nothing to confirm, evaluate, or otherwise analyze" the report. Bendick Dep. at 85–87.

However, upon close review of his testimony, the Court notes that Bendick actually said that he "read [the report] thoroughly," he thought he had discussed certain points with Wertheimer, he believed that he made certain calculations, he checked numbers as to their plausibility, and he "thought about it a good deal." Bendick Dep. at 87. He also believed that he checked the report against some external sources before rendering his opinion, but he did not say which sources. *Id.* at 87–88. Although defendant has overstated the paucity of evidence supplied by Bendick's analysis, it is evident that Bendick's was not a thorough review of Wertheimer's work. Bendick admitted that he did not check the "arithmetic processes," or attempt to verify "those sorts of things." *Id.* at 78. He also stated that he did not "independently look at the data and his different data sources," or make an independent assessment about which data source Wertheimer chose to use. *Id.* at 79. Finally, Bendick said that he relied on his personal knowledge of Wertheimer's work and reputation when he stated that he agreed with Wertheimer's analytic approach, and that it was implemented with appropriate professional care. *Id.* at 80. In light of this testimony, Ben-

dick's vouching for Wertheimer's report adds little to its value; neither does it detract from it. As a separate source of evidence, however, Bendick's report provides little assistance and has scarce probative value. Its value will rise and fall with the value of Wertheimer's report.

Turning to that report, the Court notes that the primary objection voiced by the defendant is that Wertheimer's analyses are unreliable in that he received little or no accurate information about the Indiana Bell workforce resizing program ("WRP"). The information he had, defendant asserts, is not the type of information on which an expert would normally rely to form an opinion. In addition, the opinions based on this information are not helpful to the jury in understanding the facts of the case. They are not relevant. At best, Wertheimer's statistical evidence can prove that the outcome of the WRP was not the result of chance, which does not help a jury decide, in an age discrimination case, what actually caused the outcome. At worst, this evidence may confuse the jury and lead them to infer causation merely from impact because of the "expert's clout." For both of these reasons, Indiana Bell has moved to strike Wertheimer's reports under *Daubert*. In the alternative, even if the Court finds the evidence admissible under *Daubert,* Indiana Bell argues it should be excluded under Rule 403 of the Federal Rules of Evidence.

Having just reviewed Wertheimer's work in an order for the related case, *Adams v. Ameritech Corp.,* IP 93–420–C, the Court will assume familiarity with the framework by which such expert testimony is evaluated. For purposes of economizing judicial resources, not to mention the natural resources in our forests, the Court will endeavor here

---

ently than those under age fifty. *Id.* He reached this conclusion in part because he compared the promotion and termination rates of Wyatt employees aged fifty or more with their "counterparts" in the general population. *Id.* at 67. The court found that his analysis "did not account for the presence in the comparison group of" people who were not similarly situated to the employees at Wyatt, which "rendered that group an unrepresentative sample for his comparison with Wyatt employees." *Id.* The court also found that

Wertheimer failed to include promotions of employees who turned fifty during the twenty-six month period in which he tracked such decisions. *Id.* For both of these reasons, the Second Circuit held that Wertheimer's report would not have been helpful to the jury and was properly excluded. *Id.* Specifically, the court stated that Wertheimer's report "assume[d] that any anomalies in the Wyatt data must be caused by age discrimination, and ma[de] no attempt to account for other possible causes." *Id.* at 67–68.

to distinguish between the testimony he has offered in the two cases. There has been no suggestion from the defendant that Wertheimer lacked the proper credentials to conduct a statistical analysis of the WRP and its results, so this discussion will focus primarily on the scientific validity of his studies, the reliability of his conclusions, and their relevance to this action.

In the related case, the Court found that Wertheimer's analyses were flawed in that they merely eliminated random chance as an explanation for the statistical disparity in selection rates between older and younger workers, without accounting for any other independent variable that might explain the association between age and termination rates. In essence, he assumed that any anomalies in the data were caused by age discrimination. Other variables might include favored job skills, education, experience, performance or self-selection. Also, his analytical framework was built on inaccurate assumptions about the make-up of the workforce at ASI and the distribution of necessary skills among members of that workforce. Crucial to the decision to exclude Wertheimer's report in the related case is the fact that his assumptions and analyses did not accurately reflect what occurred during the downsizing. In fact, Wertheimer did not know what had occurred, and he did not account for it in his analysis. In essence, the Court refused to allow Wertheimer's testimony in *Adams* because he failed to demonstrate, either in his opinion or in his subsequent testimony, that he employed an appropriate scientific method for determining the significance of the difference in termination rates for workers under the age of forty and those age forty or more.

That finding is even more appropriate here. As indicated in the introduction to Wertheimer's report, the task he was given by plaintiffs' counsel was to "analyze the age structure of Indiana Bell's management workforce [and] the process of selecting employees for terminations associated with the 1992–1993 Workforce Resizing Program."[3] Def's Tab 1. This stated purpose provides the only evidence of the "specific question that is under investigation." *See* **Moore's Federal Practice: Reference Manual on Scientific Evidence** 423 (Fed.Jud.Ctr.1995) (**"Moore's Reference Manual"**). "Research begins with a clear formulation of a research question. The data to be collected and analyzed *must relate directly to the immediate issue;* otherwise, appropriate inferences cannot be drawn from the statistical analysis." *Id.* (emphasis added). These statements, found in the chapter on "Research Design" in **Moore's Reference Manual,** provide the Court with the first step of the scientific method for statistical research. Once a clear formulation of the question is posed, the next step is to decide which model to use to evaluate the question. *Id.* Finally, the expert should interpret the results, either in terms of statistical or practical significance.

The first problem noted with Wertheimer's report is that the "research questions" are unrelated to the real issues in the case. There is no dispute about the age structure of Indiana Bell's management workforce prior to the WRP.[4] Nor is there any dispute

---

3. Two other questions were posed regarding the termination incentives and the financial implications for the Ameritech pension system. Those two questions, however, and the results reported by Wertheimer of his analysis of same have been labeled "superfluous" by the plaintiffs. Pls.' Brf. In Oppos. To Def.'s Mot. To Strike Expert Test. at 26. They are not relevant to the current discussion.

4. Wertheimer's inferences drawn from this descriptive data is that "Indiana Bell has valued experienced management employees," and "prior to the Work Force Resizing Program, experienced workers made up a higher share of Indiana Bell's managerial workforce than for U.S. employers as a whole." Wertheimer Rep. at 3–4, ¶ 5. He concludes from this that "Indiana

Bell had apparently valued an experienced management work force as shown by their employment of a disproportionate percentage of employees age 40 to 49 prior to the Workforce Resizing Program." Wertheimer Rep. at 21. He also used his interpretation of the age makeup of the work force in drawing a conclusion about the differences in the termination rates between older and younger workers. *See Id.* at 6, ¶ 8 ("in spite of its apparent preference for experienced employees, [Indiana Bell] terminated a disproportionate share of workers at least age 40"). The Court discerns no scientific explanation for Wertheimer's interpretation of this data, or its subsequent use, and finds this portion of his report to be scientifically invalid.

about the fact that a greater percentage of workers aged forty or more were selected for termination (56 of the 59 selectees). What is crucial for ADEA purposes is a determination of what caused the disparity.

The *second problem* is that Wertheimer said he was going to "analyze the *process* of selecting employees for termination," when he in fact only analyzed the *results* of the termination process. Making matters worse, he then worked backwards from the results and "analyzed" (or rather speculated) that the process treated older workers differently. He did this without researching any other possible explanations for the observed disparity, indeed, without even knowing anything specific about the WRP process used by Indiana Bell. Wertheimer 5/22/95 Dep. at 161–62. In fact, Wertheimer characterized the information he had received from plaintiffs' counsel as an "impressionistic view" of the process, without any detailed or specific information. *Id.*

Nevertheless, Wertheimer concluded that the "evidence in [his] report is consistent with the Indiana Bell 1992–1993 Workforce Resizing Program *treating* employees at least *age 40* differently from employees under age 40." Wertheimer Report at 21 (emphasis added). This conclusion is not based on an application of the scientific method for statistics, because it infers from statistics that merely demonstrate an association between two variables, that one variable caused the other. For that conclusion to be valid, the scientific method would require more than the cursory treatment applied by Wertheimer. The most appropriate scientific method for determining causation is a controlled experiment, but observational studies may be useful under certain circumstances. **Moore's Reference Manual** at 347, 350. For example, when the association between the two variables is seen in several different types of studies among different groups, the chance that the observed association is due to a defect in the study or a unique characteristic in the group is reduced. Or, when the results of a study hold while the effects of

plausible confounding variables are taken into account by appropriate statistical techniques, the causation conclusion would be supported. Likewise, when there is a plausible explanation for the effect of the independent variables, so that the causal link does not depend only on the observed association, a conclusion of causation would be more reliable. **Moore's Reference Manual** at 351–52. These circumstances increase the likelihood that a valid causal relationship has been identified.

None of those circumstances are present here. Wertheimer did not conduct any other studies, using any different populations at Indiana Bell, nor did he account for the effects of plausible confounding variables by any method.[5] Finally, Wertheimer explored no other plausible explanations for the effect between the independent variables. In other words, Wertheimer simply inferred from the fact that a greater number of older workers were selected for termination, that it was their age that caused them to be terminated. His methodology is not scientifically valid for answering the research question he actually posed (analyze the process of termination), nor is it valid for understanding the issue for which the plaintiffs seek to employ his opinions (showing disparate treatment).

To be admissible, testimony must be relevant to the facts the party intends to prove under the legal theory that has been chosen to support the party's claim. *See* **Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice And Procedure: Evidence** § 5162. "Relevance is a relationship between the evidence offered and the fact it is supposed to prove." *Id.* A piece of evidence may be excluded as irrelevant in one of two ways. First, it may provide satisfactory proof of a fact in dispute, but the fact for which it is offered is not a material fact in the case. *Id.* Second, it may be directed at a material fact, but not have any value as proof of that fact. *Id.* A material fact is a "fact that is of consequence to the determination of the action." Fed.R.Evid. 401.

---

5. A confounding variable is a variable correlated with the independent variables such that it is not clear whether the change in the dependent varia-

ble occurred because of a change in the independent variable or in the confounding variable.

■ Wertheimer's analyses and opinions miss the relevance mark in both ways. First, his efforts at measuring the statistical significance of the disparity between selection rates for older versus younger workers relates to the "fact" of whether there was a difference between the number of older and younger workers who were selected. That fact, however, was not seriously in dispute, nor is it material to the issue of whether Indiana Bell chose the older workers for termination because of their age. Second, his assessment of the significance of the disparity, although directed at the material fact of causation, has no value in proving that fact. This is because, as noted above, he did not use an appropriate method for determining causation, and the circumstances that would allow the use of an observational study were not present. Thus, his testimony cannot be considered relevant, and would not be helpful to the finder of fact.

Even if Wertheimer's testimony were to be considered reliable and helpful under *Daubert*, it would not pass the Rule 403 balancing test. The probative value of his questionable methodology, incomplete research, and shaky conclusions, would be substantially outweighed by the distinct possibility of confusing the jury about the relevant issues. It would also be outweighed by the danger of misleading them into inferring causation from the fact that an expert found the disparity in selection rates "statistically significant."

Statistical significance is an expression of the probability of achieving a certain result by chance. It is often measured by $p$-values. When a statistician computes the $p$-value for any set of data, he or she is determining the probability of getting, just by chance, test data as extreme as the actual data obtained, given that the null hypothesis is true. **Moore's Federal Practice: Reference Manual on Scientific Evidence** 402 (Fed.Jud. Ctr.1995) ("**Moore's Reference Manual**"). A "null hypothesis" is the hypothesis that there is no difference between two groups from which samples are drawn. *Id.* at 401. For example, the null hypothesis in this case would be that there is no difference between Indiana Bell employees who are under forty

and those forty or more in terms of the criteria used to select them for termination. Thus, if the selection rates found in samples of the two age groups at Indiana Bell are not the same, then the $p$-value would give the probability that this data resulted from "the luck of the draw." *See* **Moore's Reference Manual** 378.

Large $p$-values are consistent with the null hypothesis, and small $p$-values undermine the hypothesis. *Id.* at 402. However, $p$ does not express anything about the accuracy of the null hypothesis, or the probability that it is true. Rather, it is computed by *assuming* the hypothesis is true. *Id.* In this case, a small $p$-value would be consistent with a disparate impact by the selection process. *Id.* Wertheimer's report indicates the $p$-value for the difference in the termination rates between the two age groups was quite small (0.0000004). Wertheimer Rep. D–2, $l.$ 15. If the null hypothesis is true, then the following conclusions drawn from Wertheimer's analysis might be useful.

Wertheimer found the disparity in termination rates between the two age groups "highly statistically significant." Use of the term "significant" in this context describes the degree of difference between the expected results, in light of the null hypothesis, and those actually obtained. Essentially it is just a label for certain kinds of $p$-values. *Id.* at 380. Its meaning is no different from, and it is subject to the same limitations as, $p$-values. *Id.* "Significant differences are evidence that something besides random error is at work, but they are not evidence that this 'something' is legally or practically important." *Id.* That is why statisticians distinguish between statistical and practical significance. *Id.* "Significance comes no closer to expressing the probability that the null hypothesis is true than does the underlying $p$-value." *Id.* at 381.

In other words, by first assuming that the two age groups will have equal rates of being selected for termination, Wertheimer tested for the actual selection rates. Next, he compared the actual results to the expected results, given his underlying assumption of no difference between the two age groups, and found the observed difference in selection

rates "statistically significant." Although Wertheimer's conclusion is internally consistent with the model he structured, it simply means that, given the hypothesis of equality, the fact that the outcome was different suggested that something besides random error was at work. For him to take the next step and conclude that the results he obtained are consistent with the claim that Indiana Bell's WRP treated older workers differently goes beyond the realm of scientific methodology and into speculation.

The usefulness of statistical evidence cannot be underrated, particularly for cases involving possible discrimination. When the appropriate methods have been employed for collecting all of the data and information needed to reach the conclusion offered by the expert, and the conclusion fits the facts at issue, the court will not hesitate to entrust to the jury the task of weighing that evidence. However, when, as here, serious doubts exist about the accuracy and scope of the information considered by the expert, and about the appropriateness of the methods employed to arrive at his conclusions, this Court will not leave it up to the jury to sort it all out.

For all these reasons, the Court finds that Wertheimer's reports are inadmissible, and cannot form the foundation on which the plaintiffs build their theory of recovery under the ADEA. Because Bendick's report is a mirror of Wertheimer's results, it is also inadmissible. Defendant's motion to strike all of the experts' reports, opinions and testimony is **GRANTED.**

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Pattern or Practice Claims

■ The ADEA does not prohibit an employer from taking actions that have a disparate impact on older workers. See 29 U.S.C. § 623(f)(1). Disparate impact as a theory of liability under Title VII provides a means of dealing with the residue of past discrimination. Troupe v. May Dept. Stores Co., 20 F.3d 734, 738 (7th Cir.1994). Past discrimination is not an issue in an age-discrimination claim, because the protected trait, age, is not immutable, it changes over time. Rather, the ADEA prohibits treating older workers differently because of their age, or taking any action based on stereotypical ideas about older workers' capabilities without considering their actual abilities. Consequently, the plaintiffs' proof must show either the existence of the prohibited intent to discriminate on the basis of age, or the universal treatment of older workers without accounting for their individual abilities. If there is no direct evidence of bias, as is the case here, the plaintiff will have to prove intent using circumstantial evidence.

Employees may enforce the ADEA against their employer either in their individual capacities or as nominal plaintiffs in an opt-in class action. See 29 U.S.C. § 626(b) (incorporating 29 U.S.C. § 216(b) by reference); Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir.), cert. den., — U.S. —, 117 S.Ct. 435, 136 L.Ed.2d 332 (1996). The employees here have done both. To state an individual claim of age discrimination under the ADEA, plaintiffs employ either the direct method of proof, or use the indirect, burden-shifting, method described in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The type of evidence that may be offered under either method includes both direct and circumstantial evidence. See Troupe, 20 F.3d at 736. Using the direct method, a plaintiff may prove discrimination by providing evidence that the fact-finder may interpret as the employer's acknowledgment of discriminatory intent. Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 396 (7th Cir.1997). For it to succeed, such evidence must clearly demonstrate the motivation of the person who made the contested employment decision. Id. (citing Cheek v. Peabody Coal Co., 97 F.3d 200, 203 (7th Cir.1996)). Essentially, the plaintiff must prove that age was the determining factor in that decision. Id.

■ When plaintiffs sue as class representatives, based on an alleged pattern or practice of age discrimination, their burden is slightly different from that necessary to prove an individual claim. A pattern or practice claim's prima facie case is established by showing that unlawful discrimination has been the company's standard operating pro-

cedure, the regular rather than the unusual practice. *EEOC v. Chicago Miniature Lamp Wks.,* 947 F.2d 292, 297 (7th Cir.1991); *Coates v. Johnson & Johnson,* 756 F.2d 524, 532 (7th Cir.1985). Usually, the proof offered for a pattern or practice claim consists of "statistical evidence demonstrating substantial disparities in the application of employment actions as to ... the protected group, buttressed by evidence of general policies or specific instances of discrimination." *Coates,* 756 F.2d at 532 (citing *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 360, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Evidence, either direct or circumstantial, of discrimination against particular individuals may form part of the proof.

Essentially there are three types of circumstantial evidence that will satisfy a plaintiff's evidentiary burden. The first, and the most commonly used, type includes evidence such as suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other "bits and pieces" from which a finder of fact could draw an inference of discriminatory intent. *Troupe,* 20 F.3d at 736. Second is evidence that employees who are similarly-situated to the plaintiff, other than in the characteristic on which the employer is forbidden from basing an employment decision, received systematically better treatment from the employer. *Id.* This is the category in which statistical evidence usually falls, commonly referred to as comparative evidence. The final category includes evidence that the plaintiff was qualified for the job in question, but was passed over in favor of, or replaced by, a person not having the forbidden characteristic, *and* the employer's stated reason (or explanation) is unworthy of credence (pretextual). *Id.*

Each of these categories of evidence is sufficient of itself to support a judgment for the plaintiff, depending on its strength in relation to the other evidence. *Id.* The first category, however, often contains various pieces of evidence, none of which are conclu-

sive by themselves, that together may "compose a convincing mosaic" of discrimination. *Id.* at 737. Nevertheless, the relative strength of each part of the mosaic must be measured against the remaining evidence. If the plaintiff's evidence of discrimination is offset by the defendant's evidence to the contrary, it may not form a part of the mosaic.

Two characteristics of this case further complicate the plaintiffs' evidentiary burden: 1) it is a class-based pattern or practice claim; and 2) the terminations occurred during a large, corporate-wide restructuring and resizing. The plaintiffs have presented no direct evidence of discrimination, attempting instead to use circumstantial evidence from all three categories to prove their case under both methods, or at least demonstrate a genuine issue of material fact. The foundation of their circumstantial proof is the statistical analyses that were conducted by the plaintiffs' experts. The Court, however, has deemed that evidence to be unreliable, irrelevant, and confusing, and has excluded it from consideration on this motion. What evidence remains must now be examined.

The most useful type of evidence for proving a pattern or practice claim of discrimination is statistical evidence of disparate promotion, hiring, or discipline practices when the employee is a member of the protected class. *See Mozee v. American Commercial Marine Serv. Co.,* 940 F.2d 1036, 1042 (7th Cir.1991) *cert. denied* 506 U.S. 872, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992). Another common type of evidence is that of a general policy of discrimination against the protected group around the company. *Id.* Here, the plaintiffs have attempted to present both types of evidence in support of their pattern or practice claim. Even though the Court has excluded the experts' reports and opinions about the results of the WRP, it cannot ignore the actual results. Fifty-six of fifty-nine employees who were selected for termination under the WRP were forty years of age or more.[6] This result justifies paying

---

6. The total number of employees at Indiana Bell in November, 1992, was 1261. Wertheimer Rep. Indiana Bell Ex. 75, Def.'s Apps. in Supp. of Def.'s Mot. to Strike, Tab 1, Ex. D–2, *11.* 9–11.

Of that number, 299 were less than forty years old, and 962 were at least forty or more. *Id.* The total number of involuntarily terminated employees was 59, three (out of 299) who were less than

close attention to the proffered evidence of a general policy of age discrimination around the company, and any anecdotal evidence.

In *Mozee*, a class action pattern or practice case involving claims of race discrimination, the plaintiffs accused their employer of engaging in a subjective promotion and discipline system that adversely affected African–Americans. *Id.* at 1042–43. They offered statistical evidence to support a disparate impact claim regarding promotions to certain jobs, and the district court found that their statistics were not defeated by the employer's "more refined" statistical analysis. *Id.* at 1043. This type of evidence is probative of both disparate impact and of a pattern or practice of disparate treatment. *Id.* at 1042. The plaintiffs also succeeded in presenting enough statistical evidence to show a disparate impact on African–Americans by the employer's practice of administering discipline. *Id.* at 1043.

For their class pattern or practice claim based on alleged disparate treatment by the employer, the *Mozee* plaintiffs added anecdotal evidence from their individual claims to the statistical evidence. *Id.* The court also considered non-statistical evidence of class-wide discrimination. *Id.* "Often plaintiff classes make out pattern or practice showings through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." *Id.* at 1051. In *Mozee*, the district court found, after trial, that the employer had violated Title VII by its employment practices that had a disparate impact on, and constituted a pattern or practice of intentional discrimination against, African–American employees. *Id.* at 1050. On appeal, the Seventh Circuit found the anecdotal evidence of disparate treatment of African–Americans strong enough to affirm the district court's finding of classwide disparate treatment, but vacated and remanded the trial court's findings on the issue of disparate impact of the employer's disciplinary practices. *Id.* Consequently, the court noted that, in light of the flaws in the plaintiffs' statistics for the disparate impact claim, the trial court "must reevaluate

as well its finding of class-wide disparate treatment." *Id.* That finding rested in part on "what appears to be a strong statistical disparity in terminations," which may be significantly affected by the re-evaluation of the discipline claims. *Id.*

The *Mozee* court also had non-statistical evidence of a general policy of discriminating, such as evidence that the employer stamped the initials of a local African–American civil rights activist on the files of each African–American job applicant. *Id.* Other evidence included a sign found in the rigging yard that said "No Nigger Riggers," evidence that only whites were allowed to request lateral bids, and that the employer had a "dismal" record of affirmative action compliance and implementation. *Id.* at 1044. This evidence was considered sufficient for a finding of a pattern or practice of disparate treatment. *Id.* at 1051. When measured against the type of evidence presented in *Mozee*, the plaintiffs' evidence here does not come close to being strong enough to offset the unreliability of their statistical evidence.

Even if it did, one must be careful when applying a case such as *Mozee*, which dealt with race discrimination in a non-RIF setting, to an ADEA-based pattern or practice case emerging from a corporate downsizing. First, a plaintiff in a race discrimination case may recover under either a disparate treatment or a disparate impact theory of liability, unlike in an age discrimination claim, where a disparate impact theory is not available. Second, when the alleged discrimination occurs in the ordinary employment context the court is focusing on an individual firing or failure to promote and it is easier to assess the validity, subjectivity, or objectivity of the employer's decision. Whereas, in a RIF context with multiple employment decisions made at one time, all of the employees could be meeting their employer's legitimate expectations, but some of them will be terminated because they compare less well with those who remain. The legitimate reason for the terminations in question is presumed to be the force reduction, and not any alleged individual misconduct or inadequate performance. Third, when an employer can show

forty years old, and 56 (out of 962) who were at

least forty or more. *Id.*

that it used a detailed, criteria-based, decentralized process for selecting those to be discharged, the RIF becomes virtually impregnable to claims of discrimination.

Nevertheless, the plaintiffs here have designated "six major pieces of evidence," in addition to their statistical evidence, that they contend demonstrate a pattern or practice of discrimination. Pls.' Brf. in Oppos. To the Mot. Of Def. for Summ. J. On Plfs' Clms. of a Pattern or Practice of Age Discrim. at 40. The Court will consider each piece in turn. They have also pointed to evidence that individual employees were allegedly selected for termination or demotion because of their age. However, to elevate individual claims to the level of a pattern or practice requires evidence that the discriminatory treatment is typical of the employer's employment practices, or that such treatment was motivated by a policy of discrimination against the protected class that pervades the entire business. *King v. General Elec. Co.*, 960 F.2d 617, 623 (7th Cir. 1992). For example, one way to satisfy this evidentiary requirement would be to identify a policy of discrimination in the employer's other employment practices that is reflected in the practice at issue. *Id.* This is not easy, for the employee must prove by "significant evidence" that the employer's policies include the regular, purposeful, less-favorable treatment of members of a protected group. *Id.*

In an attempt to make that showing, the plaintiffs point to evidence that in late May or early June, 1992, Chairman Bill Weiss ("Weiss") discharged four senior managers in the Ameritech Corporation hierarchy,[7] three of whom were in their fifties. Plfs.' Ex. 32, Weiss Dep. at 52. According to the plaintiffs, these managers were "replaced" by substantially younger managers who Weiss dubbed "young team captains." Plfs.' Ex. 5, Rao, *The Painful Remaking of Ameritech.*

The flaw in this argument is that no evidence connects the departure of four senior executives at Ameritech Corporation with the plaintiffs' selections for termination at Indiana Bell. Weiss was not a decision-maker at Indiana Bell. Moreover, Weiss' designation of the four men as leaders in the process of examining how to refocus Ameritech Corporation's business occurred three months before the discharge of the senior executives.[8] Plfs.' Ex. 32, Weiss Dep. at 52.

The younger individuals included Gary Drook, president of Ameritech Publishing, Dick Brown, president of Illinois Bell, Barry Allen, president of Wisconsin Bell, and Richard Notebaert, president of Indiana Bell, and their ages at the time were between forty-three and forty-seven. *Id.* at 52, 57. The senior executives who left included Robert Barnett, age fifty-one and vice-chairman and president of Ameritech Bell Group, Bruce DeMaeyer, fifty-three and head of Ameritech Mobile Communications, Kenneth Millard, forty-five and president of Michigan Bell, and Harold D'Orazio, fifty-two and a senior executive at Ameritech Services. *Id.* at 53–61.

None of the younger managers succeeded to any of the positions held by the senior executives who left, with the possible exception of Notebaert, who became president of Ameritech Services sometime in late May or early June of 1992, after D'Orazio took early retirement. *Id.* at 175–76. Rather, when these managers were appointed to the "lead team," as Weiss put it, each was to retain all of his former responsibilities. *Id.* Although a contemporaneous newspaper account characterized their appointments as a decree "that these individuals would run the company," Weiss denied having said or meant that.[9] *Id.* at 53. Even if their appointments could be considered "better treatment," none of the younger executives could be considered *sub-*

---

7. This portion of Weiss' testimony is under seal.

8. Weiss was also sixty-three years old at the time he allegedly referred to four men in their mid to late-forties as "young." Weiss Dep. at 30. The defendant has also noted that two-thirds of the plaintiffs are in the same age category as the four team captains.

9. The Court notes that the plaintiffs rely extensively on newspaper articles to support their

claims about what was said and what happened, without mentioning that oftentimes Weiss did not admit or recall having made the statements. In some cases, Weiss specifically denied any such meanings. Plfs.' Ex. 32, Weiss Dep. at 53, 69. In this case, the statement is merely a reflection of the author's opinion. *See* Pls. Ex. 4, Rao, *The Painful Remaking of Ameritech.*

*stantially* younger. *See Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) (ten-year difference in age is presumed "substantial"). In addition, given the fact that the younger managers were appointed months before the senior executives left, the Court cannot characterize their appointments as "replacing" the senior managers, and refuses to endorse that inference as reasonable.

■ Another incident offered by the plaintiffs as evidence of Indiana Bell's alleged general policy of treating older workers worse than younger ones is the selection of approximately twelve managers in salary grades seven and above for termination in September 1992.[10] According to the plaintiffs, all of those selected were more than forty years old, and eight of them were fifty or older. The documents cited by the plaintiffs, however, only included salary grades six, seven and eight, making it difficult to assess the evidentiary support for this contention. *See* Plfs.' Ex. 16. Moreover, the plaintiffs have not shown that age was a determining factor for the termination of these managers, only that each manager was within the ADEA-protected age category. In fact, no evidence was presented about the selection process used. This represents another attempt by plaintiffs to prove their case using the disparate impact method. Without evidence of how these managers were selected, or evidence that they were selected because of their age, or because of age-based stereotypes, the Court cannot find that these discharges provide any evidence of a general policy of discriminating against older workers.

■ The remaining four pieces of key evidence proffered by the plaintiffs fare no better in proving the pattern or practice case. Plaintiffs spend most of their time discussing IBT president Thomas Reiman's ("Reiman") comment about having a continu-

al influx of "new young crazy people" to keep the business from "drying up." Pls.' Ex. 33, Reiman Dep. at 299. Although this remark could be interpreted as indicating an intent to replace terminated employees with young people, that inference is not reasonable in light of its context.

Reiman was responding to questions during a video conference session shortly after he became president of IBT. *Id.* at 297–98. One question was whether IBT would begin to promote people again, after years of a promotion freeze. Pls.' Ex. 2, Trans. Of Videotape. Reiman first acknowledged that the question reflected one of the challenges to the business, and before giving a direct response he discussed how to "develop folks" and keep them challenged, without necessarily giving them promotions. *Id.* He then admitted that he did not foresee the company being in a position, in the next five years, to give the number of promotions it had in the past. *Id.* He also contrasted promoting with developing, and suggested that his goal was to change "the whole status of what training and development is." *Id.*

Specifically, he said that, as opposed to being something that is just "fit in" whenever there was time, training and development would become a "major focus" of the company. *Id.* Reiman remarked that when people have done a specific job for a while and are becoming a little bored, the company needs to have a system in place that will allow them to transfer and be retrained. *Id.* In addition to all this, he said, the company needed to be able to promote people, and to find a way to hire new people. The latter comment seemed an afterthought, as did the subsequent remark, which forms the basis for plaintiffs' claim of age-related bias. In the context of his expressed concern for keeping employees challenged, developing them, hiring new people, and by implication develop-

---

**10.** There is some dispute about the actual number of managers within these grades, and about the number who were selected for discharge. What is not disputed is that none of these upper-level managers are plaintiffs in this action. The plaintiffs allege that these upper level managers were evaluated and selected for termination before the rest of the resizing process occurred because the company did not want them to at-

tend the annual planning meetings. Plfs.' Brf. at 14. In support of this contention they cite certain pages of the deposition of Thomas Reiman, the president of Indiana Bell. *Id.* (citing Ex. 33, Reiman Dep. at 51–52). However, those deposition pages were not included in the cited exhibit, leading to a failure of proof on a point that, regardless, is irrelevant.

ing the business, Reiman said, "The business will absolutely dry up and die if we don't have a continued influx of new young crazy people . . . ." *Id.*

At his deposition, Reiman explained that by "new young crazies," he was referring to a subset of the types of workers IBT needed to hire to maintain diversity, which would consist of people who did not think the same way that he might think, or that an engineer might think. Reiman Dep. at 299. He specifically noted that his remarks at the video conference were not related to the subsequent downsizing, but were instead tied to ideas that had been generated during his Breakthrough Leadership sessions. *Id.* Likewise, when explaining how the company would make room for new hires and promotions, Reiman said, "we're gonna [sic] have to find a way for people that aren't performing up to the standards that we, as employees of the company, set exit the business. . . . we're goin' to have to find a way to get the . . . poor performers out of the business and replace those people with new hires and open up opportunities for promotion." Pls.' Ex. 2. Thus, even if he were drawing a connection between hiring "young crazies" and terminating incumbents, Reiman clearly expressed the criteria that would be used for selecting those to be discharged: performance.

According to Reiman, who was a team captain for the "Breakthrough! Leadership" project, the subsequent resizing program was a response to the company's change from a regulated monopoly to a competitive environment. *Id.* at 227. "One of the things that stood out was that there was a big distance between the front line person who dealt with the customer and where the authority and the information in the company resided. And so the effort was on the one hand to reduce that bureaucracy . . . and on the second to get our costs more in line." *Id.* at 227–28. That distance was populated by what is commonly called middle management. The size of the workforce was also a problem, Reiman noted, both from the cost standpoint and from an efficiency standpoint. *Id.* at 230. For example, a business office service representative would have to go through five layers of management to get to someone who had the authority to say "yes" to a customer. *Id.* The goal of the resizing was to reduce that to only one or two layers, "or even better still, to empower that person on their own to do it." *Id.*

Instead of indicating the intent to replace an aging workforce with younger employees, Reiman's comment, taken in context, falls into a general category of "stray remarks" that by themselves do not prove actionable discrimination, even if repeated. *See Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir. 1990). The remark is but one sentence buried in two single-spaced, typed pages of the transcript of this portion of the video conference. It also constitutes a random reference to hiring, that was only tangentially related to the bulk of Reiman's remarks. Not only does the remark constitute a departure from the main thrust of Reiman's other remarks, but it also does not reflect age bias. An expressed willingness to hire people who see things differently than the rest of the company's employees, does not constitute a preference for younger workers, and an inclination to weed out older ones. The plaintiffs argue that Reiman's remark is ambiguous, and that its meaning should be discerned by a jury. The Court cannot agree.

In order for this "fact" to require deliberation by a jury, it would need to be material to the outcome of the case. That is its most significant failing. Reiman was not a decision-maker in the sense that he could control who among the employees at IBT would be selected for termination. He had no involvement in establishing the actual selection process, or in the mechanical creation of "at-risk" lists, or in discussing and ranking those employees who were at risk. *See* McFeeley Aff. ¶ 15. His only involvement was to draw lines on lists of ranked employees in the various salary grades, below which employees would be asked to leave. No evidence has been presented to show that his involvement in the process could have affected its outcome. Moreover, the remark at issue was made several months before the 1992–1993 Workforce Resizing Program began, and nearly six months before any of the plaintiffs' terminations. For these reasons, the Court

finds that Reiman's remark is too remote in time and subject-matter to be a material fact in dispute.

Frequently during this litigation, the plaintiffs have taken off-hand, vague and generalized remarks and offered them as an indication that the defendant's motive was to discriminate against them because of their age. It is not clear whether plaintiffs mean that the overall decision to resize was intended to weed out older workers, or if the actual selection decisions were made with that intent. If their theory is the former, it is defeated by voluminous evidence of the self-analysis conducted by Ameritech and its subsidiaries to determine how to improve their business and become more competitive. It also pales in the light of frequent contemporaneous, non-discriminatory, explanations for the decision to resize, and the specific instructions in the resizing program's selection guidelines that age should not be a factor in any decisions.

On the other hand, if plaintiffs see these remarks as supporting a finding that each decision during the selection process was made with the intent to get rid of older workers, they have failed to account for the fact that the quoted general remarks, and the sentiment plaintiffs wish the Court to read into them, were not made by the relevant decision-makers.[11] The evidence is that the process used by IBT for selecting those to be terminated was developed by Robert McFeeley ("McFeeley"), IBT's director of human resources at the time. *See* McFeeley Aff. ¶¶ 3, 13, 14. McFeeley received no input from IBT president, Reiman, regarding the criteria to use to determine which managers should be discharged, or about any particular results that were to be achieved. *Id.* ¶ 15. Likewise, McFeeley's boss, Fred Peters, made it clear that the process was to select people based on "performance and skills, not age, years of service, pension status, or any

other prohibited characteristic." *Id.* The plaintiffs have failed to offer any evidence to contradict McFeeley's testimony regarding these matters, which further indicates the absence of evidence connecting Reiman's remark to the overall selection process.

Neither can his remark be associated with any individual termination decisions, as a review of the selection process will demonstrate. The first step of the selection process was for human resources managers to mechanically rate employees within each salary grade according to their most recent evaluations of managerial skills, assessments of promotional potential, and their past two-years' performance.[12] *Id.* ¶ 20. The greatest weight was given to the information about the employees' performance over the past two years. *Id.* Each of these three components of the "mechanical" ranking process reflected information that had been gathered and documented in the employees' files long before any decision had been made about resizing, using criteria that had been in place at IBT for many years. The next step involved hands-on rankings of those who were placed on the "at-risk list" by their scores in the mechanical process. *Id.* ¶ 26. The department heads were allowed to review these lists and add to or subtract from them as long as they provided written explanations for those decisions and obtained approval from the vice president of human resources, Fred Peters. *Id.* The departmental reviews resulted in only a few changes, the most common reasons for which were a decline in performance that justified adding an employee, or deleting an individual who had unique skills or abilities that could not be easily replaced. *Id.* ¶ 27.

After the "at-risk" lists were finalized, eight ranking committees were convened, comprised of managers at salary grades six or above, to discuss and rank all of the employees on the lists. *Id.* at 33. The eight

---

11. In addition, Reiman's June 1992 remarks were remote in time, as well as context, from the actual termination decisions, which were made in late October and early November, 1992.

12. The mechanical process was applied to all except 153 employees in salary grades five or below, but these employees were reviewed individually. McFeeley Aff., ¶ 28. According to the plaintiffs, these individuals were "excluded" from the process, and many of them were employees who had been at IBT for five years or less. Their "exclusion" is another one of plaintiffs' key pieces of evidence and will be discussed more fully below.

committees met in mid-October 1992 for ranking sessions that were facilitated by a member of the human resources department. The process of ranking involved giving each committee member a summary of the data that caused the employee to be on the list, and making sure that at least one person on the committee was familiar with the work performance of each employee to be ranked. *Id.* ¶ 34. The committee numerically ranked each employee based on discussions during the ranking sessions. *Id.* ¶ 37. At the time of the rankings, the committee members had been provided with no information about any employee's age, pension status, race, gender, or other protected characteristic, nor did they know how many employees in any group would ultimately be selected for termination. *Id.* ¶¶ 34, 39.

Once the rankings were completed, the committees' task was finished. The lists of ranked managers were then given to IBT's officers, who had to determine where the lines would be drawn between those to be retained and those to be terminated. *Id.* ¶ 40. McFeeley attended these officer sessions, held in late October 1992, and noted that the officers did not change any of the rankings, or base their decisions about the lines on any employee's age. *Id.* Instead, their decisions were governed by the number of managers who had volunteered for early retirement in light of the overall goal of reducing the workforce by ten to fifteen percent, the business needs of the company, and the number of employees they predicted would accept the early retirement package. *Id.* ¶ 41. Thus, assuming that Reiman's comment reflected a preference for younger workers, his participation in the "line-drawing" could not have affected the rankings of any employees or influenced the overall number of older workers who were selected.

When viewed in their historical context and in the context of the other evidence, Reiman's remarks do not justify that assumption, or reflect any intent to select workers for termination because of their age. On the contrary, it is apparent that the resizing program grew out of a corporate-wide restructuring of the business to become more competitive. Although many people in man-

agement positions at IBT would be terminated by the program, their terminations occurred after each employee was carefully evaluated by a group of higher level managers, using specific criteria relating to the projected business needs identified by IBT's strategic planners. That a disproportionate number of those people were over the age of forty does not mean that the entire resizing program was an intentional plan to discriminate against older workers. So far, none of the plaintiffs' evidence creates an issue of fact for trial.

The fourth category of evidence proffered by the plaintiffs to show that IBT used age to determine who would be selected for termination is the alleged "excluded younger workers." According to the plaintiffs, IBT excluded seventy workers who had five years or less of service from the selection process, and of these seventy the median age was twenty-seven. In the plaintiffs' own words, "Reiman and Indiana Bell decided to exclude those managers hired within the last five years from the resizing Program by presumptively excluding them from the 'at risk' lists." Pls.' Brf. at 41. In support of this contention, they cite a document entitled "Proposed Selection Process," Pls.' Ex. 1, and another one that appears to be a list of Indiana Bell employees with less than five years of service, sorted by age. Pls.' Ex. 19. The first exhibit is McFeeley's initial proposal to the IBT officers for how to select employees for termination. *See* McFeeley Aff., ¶ 20. It contains some hand-written notes on it, including the note "Add to Basic List" next to the section covering what to do with managers who have less than five years of service. Pls.' Ex. 1. Plaintiffs make much of the fact that the first statement in this section is "These managers will be excluded from the basic process." *Id.* Standing alone, this statement would seem to support the plaintiffs' theory that those employees with five years or less were excluded from the process, which would raise factual questions about this alleged "different treatment" of younger employees.

However, the statement does not stand alone, in spite of plaintiffs' assertions to the contrary. In addition to the hand-written

note mentioned above, the exhibit also contains the following instructions for handling these employees:

-HR will research performance indicators and provide to Department.

-Departments will review performance skills and potential.

-Departments will indicate any that should be considered "at risk".

-HR will maintain a company list.

*Id.* Also included in this exhibit is a page with sections titled "Treatment of Missing Data," and "Less Than 5 Years Service." *Id.* McFeeley suggested that the latter category be handled by "selecting all," researching merit increases, and researching any other available data that would assist with reviewing their performance and potential. *Id.*

These instructions are also consistent with those in a letter sent by McFeeley to department managers with lists of employees who were "at risk" after the mechanical review at step one. Pls.' Ex. 106. In the letter, McFeeley notes that some managers may have gotten a separate list of those with less than five years of service, those with limited historical data, or transfers from other entities. *Id.* The total number of employees in this category was 153, not seventy. His instructions regarding the additional list were for the managers to review the list and write "review" next to the name of "any incumbent that should be *retained* on the list for final ranking." *Id.* (emphasis added). According to McFeeley, the mechanical process was used to select all members of the at-risk group, except for the 153 on the separate list. Among those were the seventy employees who had less than five years of service. McFeeley Aff. ¶ 28.

These 153 employees were reviewed separately to determine if they should be retained on the at-risk list. *Id.* The plaintiffs see this treatment as putting these workers in the same category as those employees who scored well enough on the mechanical evaluation to escape the at-risk lists. Pls.' Brf. at 48. They also stress that "no contemporaneous document explains the reason for the five-year rule." *Id.* at 22. The defendant's subsequent explanations, the plaintiffs argue, differ enough from each other that they create a genuine issue of material fact. Fred Peters, IBT's vice president for human resources, explained the separate treatment in his May 8, 1995, deposition, as caused by the fact that the company had incomplete performance data for them. Pls.' Ex. 41, Peters Dep. at 80–81. McFeeley's affidavit, dated June 10, 1996, indicated that the different treatment was necessary because IBT did not have sufficient data to use the mechanical formula, and because application of that formula might not provide accurate assessments of those employees. McFeeley Aff. ¶ 29. The Court discerns no real difference between "incomplete" data, and "insufficient" data, and does not find the two explanations conflicting.

Plaintiffs' interpretation is that IBT has changed its explanation of the purpose behind the "five year exclusionary rule," as plaintiffs call it, for purposes of this litigation. They accuse IBT of now claiming that the purpose of the rule was to give more, rather than less, scrutiny to newer managers, and they call this *post hoc* reasoning that is inconsistent with the directions McFeeley gave to department heads at the time.[13] The Court disagrees. The plaintiffs have miscon-

---

**13.** The plaintiffs have referred to McFeeley's explanation in his affidavit for the different treatment of those with less than five years service as "newly-minted." *See* Reply Brf. In Supp. Of Pls.' Mot. To Recon., May 5, 1997, pp. 6–7. They also assert that in spite of being "specifically asked to explain the exclusion," McFeeley did not offer the "consent decree" reason during his deposition. *See* McFeeley Dep. at 107. Yet, during his deposition McFeeley explained that those with less than five years service were excluded from the basic process of mechanical evaluation, because of "limited data on these people." *Id.* No one asked him why the data was limited.

Furthermore, by carefully reading McFeeley's affidavit, it becomes apparent that he provided two reasons for the different treatment: 1) IBT did not have all the necessary data to use the mechanical formula; and 2) application of the mechanical formula might not yield an accurate assessment of those employees. McFeeley Aff. ¶ 29. The "consent decree" explanation was not mentioned until McFeeley offered a more detailed explanation of the second reason. None of this testimony is inconsistent with the deposition explanation that "limited data" was available.

strued the evidence and the facts it supports. A separate list of recently-hired managers was given to the department heads, along with whatever data the human resources department could obtain from its research on them, and the department heads were asked to review the list to determine if the newer hires should be "retained on the list for final ranking." Pls. Ex. 106. Not only does plaintiffs' exhibit 106 provide a contemporaneous document that supports the defendant's explanation, it also suggests that the managers on the separate list were "at risk" until they were reviewed and escaped retention for "final ranking." In fact, in contrast with the detailed instructions given to department heads for adding to or deleting names from the mechanically-generated lists, their instructions for adding the newly-hired managers did not even require an explanation be given. The Court cannot find any basis for asking a jury to determine if the different treatment of managers with less than five years service was a violation of the ADEA.

Another piece of evidence offered by the plaintiffs to supplement their statistics, and in support of finding a pattern or practice of discrimination, has already been considered in terms of whether it reflected a company-wide policy. By merely pointing to the termination of nearly a dozen upper level managers, all of whom were over forty, the plaintiffs have not provided evidence of different treatment on the basis of age. They term this "conduct toward older workers consistent with an age bias or stereotype." Pls.' Brf. at 48. Yet, there is no evidence that these managers were selected because of their age, and nothing to counter the defendant's explanation that these managers were selected for termination based on their relative performance compared to others at that level.[14] Nor does it "send a message" to lower level managers about the types of people the selection process should target. No evidence has been presented that the ages of the terminated upper level managers was known. In addition, of the fifty-seven managers at salary grade seven or above, all but twelve were over the age of forty. In the absence of any evidence from the plaintiffs about how these managers were selected, and with IBT's explanation that they were selected based on performance, the Court finds that this evidence does not raise a factual issue for the jury.

■ Finally, the plaintiffs' last two "key pieces of evidence" do not provide any more support for their pattern or practice claim than any of the other submissions. First, they point to a statement allegedly made by Reiman in early November 1992, that the people who least have the skills necessary for the future will be asked to leave IBT. *See* Pls.' Ex. 109, *Indianapolis Star* article, "Dial C for change at Indiana Bell." Again, the plaintiffs have taken one random statement out of context and built it up to a powerful indictment of IBT's motives. In context, Reiman's alleged remark followed the statement that "Indiana Bell has devised a 'very elaborate process' to evaluate employees whose jobs are being wiped out and the company wants to keep those with the best skills." Pls.' Ex. 109. According to the plaintiffs, Reiman's reference to "skills necessary for the future," is code for "uprooting older workers." *See Futrell v. J.I. Case,* 38 F.3d 342, 348 (7th Cir.1994). They also argue that this specific reason was not offered to them in explanation of any individual termination. Neither of these points weaken IBT's evidence that it did use a "very elaborate process" to base termination decisions on individual assessments of each employee's skills and abilities. This evidence fills out the context for Reiman's comment, and makes it unreasonable to infer that his reference to keeping those with the best skills was just an instance of paying lip service to the appropriate reasons for the terminations and covering up the real reasons.

---

**14.** In support of this explanation for how these upper level managers were selected, Indiana Bell cites certain pages of the depositions of Fred Peters and Mike Farmer, as well as "IBT Exhibit 24." The Court has been unable to locate these pieces of evidence, but the plaintiffs have not disputed the statements made by IBT about the method of selection of these upper level managers. Rather, the plaintiffs focus on the results of the selection and the inferences to be drawn from the fact that all twelve managers were over the age of forty. In responding this way, the plaintiffs have conceded the defendant's statement of these facts.

■ Second, the plaintiffs have emphasized in their argument the alleged statement, "Ameritech need[s] to ventilate the business. Make room for the new culture." Pls.' Ex. 45, Williams Dep. at 160. They present this statement as revealing Ameritech's real motive of wanting to fire older workers to make room for newer, younger ones. Two obstacles prevent the plaintiffs from succeeding with this portrayal. First, the only "evidence" they cite in support of the fact that such a statement was made is composed of triple hearsay. During his deposition, plaintiff Ron Williams ("Williams") reviewed notes he had recorded in August 1992, in one of which was a quote that allegedly came from Noel Tichy ("Tichy").[15] *Id.* Specifically, Williams stated that "Noel Tichi, [sic] who was a consultant for Bill Weise, [sic] told Bill Weise, who told Bob Knowling, who told us" the quoted statement about Ameritech needing to ventilate. *Id.* The reliability problems with this testimony are obvious.

Even if it were true that Tichy opined that Ameritech needed to ventilate and make room for a new culture, the second obstacle is the relevance that would have to the issues here. Assuming that it accurately represented the reason Tichy thought Ameritech should downsize, Tichy was not the relevant decision-maker with respect to any issues or decisions in this case. In fact, he was an outside consultant hired to express his opinions. Moreover, against the backdrop of a dramatically-changing marketplace, in which an older, regulated monopoly would be required to compete with newer, leaner companies, the statement is more likely a reflection of Tichy's opinion about how Ameritech can become competitive. The implications discerned by the plaintiffs in Tichy's alleged statement are not realistic when considered against this backdrop, and in light of subsequent events in which an elaborate process was implemented for measuring each individual employee's abilities against the established needs of a more competitive telephone company.

■ Another plaintiff, Lawrence Shelton ("Shelton"), attributes a "ventilation" comment to McFeeley. Shelton stated that while he and McFeeley were on smoking breaks he overheard McFeeley talking with his former boss, Sy Butler, about "ventilating the corporation," and about "making room for younger people to move up." Pls.' Ex. 79, Shelton Dep. at 146. Upon closer examination, however, Shelton admitted that McFeeley had only remarked that there were a lot of people with older ideas, which Shelton interpreted as meaning the company wanted to make room for younger people. *Id.* at 149–50. McFeeley also allegedly said that ventilation meant "opening up the organization for promotions." *Id.* at 150. Shelton specifically denied that McFeeley mentioned old people, just people with old ideas, for which some managers used the term "Bell-shaped Heads."[16] *Id.* at 152. None of the statements Shelton actually attributes to McFeeley demonstrate the intent to weed out employees on the basis of their age.[17] Rather, the only reasonable inference that could be drawn from McFeeley's alleged statements is that one of the purposes of the resizing program was to identify those employees who continued to think and act the way they did when Indiana Bell did not face such a competitive environment. Moreover,

---

15. Noel M. Tichy is a management consultant and professor at the University of Michigan, who consulted with Ameritech Corporation's chairman, Bill Weiss, during 1991 and 1992. According to an article submitted by the plaintiffs, Tichy helped Weiss design the "Breakthrough Leadership" program implemented in 1992 and 1993. Pls.' Ex. 5.

16. According to Shelton, the term, "Bell Head," or "Bell-shaped Head," referred to managers who had been with Indiana Bell for a long time, which usually meant they were older. Shelton Dep. at 146–47. But he also said it meant people with older ideas. *Id.* at 152.

17. To suggest that it does is another example of the type of "word games" played by counsel for the plaintiffs. *See Testerman v. EDS Technical Prod. Corp.,* 98 F.3d 297, 302 (7th Cir.1996) (noting that a reference to the "old" data center, one that no longer existed, did not constitute proof of age bias). Noting that a person's ideas are "old" is not the same thing as referring to a person's age. *See Larimer v. Dayton Hudson Corp.,* 137 F.3d 497, 500 (7th Cir.1998) ("one's age has no necessary correlation to whether or not one's ideas are 'young' or 'fresh.' ").

this interpretation is consistent with the reasons offered by Weiss and Reiman for the workforce resizing. Shelton's testimony does not create an issue of fact for the jury.

The plaintiffs' proffered six pieces of evidence, as well as other bits and pieces of evidence that alone do not represent proof of any discriminatory motive, have been offered in an attempt to bolster the statistical analyses performed by the plaintiffs' experts. The Court has considered this evidence, singly and in combination, and found that it does not suffice to lend a summary-judgment-defeating hand to the statistical evidence regarding the results of the process. The plaintiffs' attempt to prove their case directly, using circumstantial evidence, has failed.

■■■ Turning to the indirect method of proof, the Court finds similar weaknesses. For statistics to establish a prima facie case, they must demonstrate a significant disparity of treatment (not impact), and eliminate the most common non-discriminatory reasons for the disparity. *See Barnes v. GenCorp, Inc.,* 896 F.2d 1457, 1466 (6th Cir.), *cert. den.,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). That is because the statistics are being asked to prove intent and motivation, or in other words, causation. This method of proof is further complicated by the RIF context, because the obvious reason for a given employee's termination is that he or she was selected by the RIF process. Assuming, without finding, that a prima facie case has been met, the burden shifts to IBT to show that it had a legitimate, non-discriminatory reason for terminating the plaintiffs. When a defendant has evidence that it evaluated the actual capability of each employee based on past performance, it becomes particularly difficult for a plaintiff to prove an illegal motive. Both of these hurdles are present in this case. The defendant has evidence that the terminations at issue occurred in the context of a legitimate corporate-wide resizing program, and that the discharged employees were selected based on a detailed, objective, evaluation process, that involved a number of managers in such a way that no single person could control the outcome of the process.

■■■ The ADEA was passed to prohibit employers from making decisions about employees "based in large part on stereotypes unsupported by objective fact." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610–11, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Its focus is on the decision-making process, rather than on its results, as born out by the fact that it specifically allows disparate results if reasonable factors were used for the decisions. *See* 29 U.S.C. § 623(f)(1). Thus, employers are to evaluate older workers "on their merits and not their age." *Hazen Paper,* 507 U.S. at 611. Here, the plaintiffs' theory presumes that those making decisions about which employees to retain at Indiana Bell, held and acted on stereotypical notions regarding older workers. For this theory to succeed, there must be some evidence that the decision-makers knew the ages of the workers they evaluated, ignored the criteria they were to use for their decisions, and that they held such stereotypical notions in the first place. No such evidence has been presented. In fact, the defendant has ample evidence that the opposite was true. The rankers were instructed to ignore the age of those who were to be ranked and were given objective criteria to apply in making their decisions. They were also intentionally screened from information about the ages of those who were being evaluated.

The Court simply cannot discern any mechanism used to facilitate decisions based on age or age-related stereotypes. Under the ADEA, an "employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly." *Id.* All of the evidence about the process IBT used to decide which employees to terminate is that a decentralized group of managers focused on specific factors, such as performance and management characteristics, and not age. Another weakness in plaintiffs' theory is that, while they acknowledge that Indiana Bell evaluated its employees by focusing on the specific factors it established for who would be retained, at the same time they argue that application of those factors had a negative impact on older workers. It is this disproportionate impact (disparate im-

pact) that underlies every permutation of their theory of liability.

For example, in an attempt to show the application of a stereotype, the plaintiffs argue that use of "growth" or "advancement" potential as a criterion for selection enabled the decision-makers to apply their own stereotypical notions about older workers. This method of proving age discrimination simply will not work. The ADEA is not violated by an employer who applies reasonable factors that have a disparate impact on older workers. In fact, the disparate impact theory was devised as a "means of dealing with the residues of past discrimination, rather than a warrant for favoritism." *Troupe*, 20 F.3d at 738.

Even if the "advancement potential" factor did allow subjectivity to enter the assessment, the plaintiffs have offered no proof that the individual decision-makers knew the ages of any of the workers they were to evaluate. That information was deliberately kept from those involved in the rankings, and they were specifically instructed to disregard the age of any employee when considering his or her ranking. The evidence also shows that once the rankings were completed by the separate ranking committees, the officers who drew the lines made no changes to any of the rankings. Thus, even if the officers had information about the ages of the employees on the ranking lists, there is no proof that this knowledge was used for purposes of deciding who to retain. The notion that an officer could decide to draw a line in one place as opposed to another based on the ages of the employees who would be above or below the line is too speculative to suffice as a probable means by which IBT violated the

ADEA. Nor does it suffice to create a question of fact for the jury.[18]

The Court has found that none of the evidence provided by the plaintiffs is sufficient to raise a genuine issue about whether IBT engaged in a pattern or practice of making employment decisions based on age, or age related stereotypes. Indiana Bell's motion for summary judgment on the ADEA pattern or practice claims is **GRANTED**.

### B. Individual Discharge Claims

Merely because the plaintiffs have failed to survive summary judgment on their pattern or practice ADEA claims does not mean that they must likewise fail on their individual claims. Had they succeeded in proving a pattern or practice of discrimination, each plaintiff would have enjoyed a presumption of discriminatory treatment, which IBT could rebut with evidence of a legitimate reason for selection in each individual case. However, they do not have that presumption, and they must instead set about proving their individual age discrimination claims in the usual fashion.

To state an individual claim for age discrimination under the ADEA, plaintiffs must offer direct or circumstantial evidence of discrimination, or use the indirect, burden-shifting, method of proof described in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Using the direct method, a plaintiff may prove discrimination by providing evidence that the factfinder may interpret as an acknowledgment of the employer's discriminatory intent. *Chiaramonte*, 129 F.3d at 396. Such evidence must clearly demonstrate the motivation of the person who made the contested

---

**18.** The plaintiffs have also suggested that the evidence of "age stereotyping and age based preference" has earned them a "mixed-motive analysis." Pls.' Brf. at 39 (*citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). Their aim is to put the burden on IBT to come up with evidence that it did not make decisions based on age, in effect shifting the plaintiffs' evidentiary burden to the defendant. Apparently, the plaintiffs misunderstand the relevant procedural context in *Hopkins*. The Supreme Court specifically clarified that the case did not deal with shifting burdens, as in *Burdine*. Rather, the employer's burden in this context is "most appropriately deemed an affirmative defense." *Id.* at 246. In other words, the defendant is not required to produce evidence that it would have made the same decision even if it had not considered age, until *after* the plaintiffs have shown that age played some role in the decision. *Id.* All the plaintiffs have done here is state the law. They have failed to show how it applies to the facts in this case. With no showing that age played a role in IBT's decision the mixed motive analysis of *Hopkins* simply does not apply. 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268.

employment decision. *Id.* (citing *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 203 (7th Cir.1996)). As mentioned earlier, to succeed on an individual age discrimination claim, a plaintiff must prove that age was the determining factor in that decision. *Id.* In other word, each plaintiff will need evidence that "but for" his or her age, he or she would have survived the RIF. *See Testerman v. EDS Technical Prod. Corp.,* 98 F.3d 297, 304 (7th Cir.1996).

The task of proving discrimination is more difficult in the context of a corporate-wide workforce resizing and restructuring, as happened here. *See Hartley,* 124 F.3d at 889; *Testerman,* 98 F.3d at 303–04 (in a case involving a reduction in force ("RIF"), a claimant must show that age "tipped the balance" in favor of his or her discharge). When an employer must reduce its workforce, "it is foreordained that some employees will lose their jobs; and ... the defendant inevitably will be able to point to some imperfection as a reason for the discharge." *Testerman,* 98 F.3d at 304. However, if the employer fires an older employee who would otherwise have survived the RIF *but for* his age, the ADEA is violated. *Id.* In this context, the court must deal with "small gradations, with an employer's subjective comparison of one employee to another, and it is incumbent upon [the court] to remember that what is at issue is not the wisdom of the employer's decision, but the genuineness of the employer's motives." *Id.*

Ordinarily, when an employee cannot provide direct or circumstantial evidence that directly proves discrimination, he or she may adopt the indirect, burden-shifting method of proof. This method is based on the legitimate assumption that if the plaintiff was doing fine in his or her job, then lost it, and was replaced by someone younger, or white, or male, or not disabled, a discriminatory motive was likely afoot. *Hartley,* 124 F.3d at 889. However, in large-scale workforce restructuring cases, the *McDonnell Douglas* method is not a particularly "efficient formula." *Hartley,* 124 F.3d at 889 (distinguishing cases in which a small scale reduction occurred, which involved no fundamental change in the way the employer did busi-

ness). Its underlying assumption rings untrue in a RIF case, which makes its application here problematic. Because the burden-shifting method "ignores the circumstances surrounding [the] termination and it presumes [the plaintiff] was singled out for termination," it is a less efficient method of proof in a RIF case. *Id.*

When an employer must reduce its workforce, employees who were doing fine in their jobs may lose them. *Id.; see also Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 943 (7th Cir.), *cert. den.,* —— U.S. ——, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997). If that reduction is coupled with a corporate-wide restructuring and a fundamental change in the way the employer does business, as happened here, the presumptions created by the *McDonnell Douglas* method of proof are further weakened. For example, in most cases the explanation for the termination is the RIF, which makes it necessary for the Court to concern itself with how the RIF was carried out, rather than what specific reasons were given for an employee's discharge. If the Court is satisfied that the selection process was age-neutral in content and application, then an individual plaintiff will find it more difficult to present enough evidence to create a genuine issue of material fact about the motivation behind his or her individual selection for termination.

In spite of these difficulties, courts continue to allow a plaintiff to use the *McDonnell Douglas* framework. Thus, an employee in a RIF case may establish a prima facie case by showing:

1. Membership in a protected age group;

2. Satisfactory job performance;

3. An adverse employment action, such as a discharge; and

4. That substantially younger, similarly-situated employees were treated more favorably.

*Chiaramonte,* 129 F.3d at 398 (citing *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996)). By establishing the elements of a prima facie case of age discrimination, the employee shifts the burden of production to the defendant, who must come forward with

a legitimate, non-discriminatory explanation for the decision. Provided that the defendant succeeds in meeting this obligation, the presumption of discrimination created by the prima facie case is rebutted. The burden then shifts back to the plaintiff to prove that the employer's stated reasons are pretextual, either by showing that they are unworthy of credence or that a discriminatory reason more likely motivated the decision. *Id.* The ultimate burden of persuasion on the issue of discrimination, however, always lies with the plaintiff. *Id.*

A crucial difference in a RIF case, is that the defendant can meet its burden of production by explaining the reasons behind the downsizing and the process used to select employees for discharge. Thus, the burden quickly returns to the plaintiff to show that those reasons were a pretext for discrimination, or that the process was deliberately designed to weed out older workers. Unlike an age discrimination case when no reduction in force occurred, the question is not whether the employee was or was not performing satisfactorily, but whether the employer "honestly believed that [the plaintiff] was the weakest member of the department." *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir.1995). Plaintiffs lose at the pretext stage if the court finds that the defendant "honestly believed in the nondiscriminatory reasons it offered, even if those reasons are foolish or trivial or even baseless." *Hartley*, 124 F.3d at 890. Thus, not only will each plaintiff here need evidence that a simi-larly-situated, substantially younger employee was treated more favorably during the selection process, but also that the decision-makers did not honestly believe in the reasons they gave for the different treatment. *See Collier v. Budd Co.*, 66 F.3d 886, 891 (7th Cir.1995).

Turning to the individual claims at issue here, the Court will, for purposes of the pending motions only, assume the establishment of a prima facie case for each plaintiff.[19] The plaintiffs are not all represented by the same counsel, nor do they each present the same evidence in support of their claims. For that reason, the Court will group them according to the counsel representing them, as has been done with other orders, and according to the theory of recovery.

One group is represented by David Rose, an attorney from Washington, D.C., who appears for the following plaintiffs: Debra Allard, Paul E. Bostrom, Barbara A. Bush, Norris F. Dendy, David H. Meyers, Richard A. Mills, Gale A. Prizevoits, and Lawrence Shelton (collectively these eight plaintiffs are referred to as the "Rose Plaintiffs").[20] Another group of plaintiffs are represented by Mark R. Waterfill, an Indianapolis attorney who appears for: John Clarke, Julietta Contreras, Dale Cotterman, George Doyle, Sandra Drexler, Susan G. Hall, Jack W. Hancock, Donald D. Hedberg, JoAnn Hinderliter, James C. Hineman, Jon Hoy, Harry Hull, Ralph Jones, Paul Kirvan, Duane Klopenstine, Joseph Lafferty, Louis McKinney,

---

**19.** The Court has serious doubts about whether plaintiffs each have satisfied the fourth prong, as no evidence has been presented of instances in which a "similarly-situated" and *substantially* younger worker received more favorable treatment than any particular plaintiff. *See Hartley*, 124 F.3d at 893 (ten-year difference in age is presumed "substantial" and when disparity is less, plaintiff must present evidence that employer considered his or her age to be significant).

If a plaintiff has not been singled out for adverse treatment, but is instead a member of a group of employees who are terminated during a RIF, he or she has a different burden for establishing a prima facie case. Here, the selections depended on the plaintiffs' relative rankings against other workers during the selection process. Those other workers must be "similarly situated to the plaintiff, both in terms of skills, and in terms of ranking." *See Fisher v. Wayne*

*Dalton Corp.*, 139 F.3d 1137, 1142 (7th Cir. 1998).

To show less favorable treatment, plaintiffs would need evidence that these substantially younger, similarly situated employees received a less stringent evaluation, or were tied in rank with a given plaintiff and only the plaintiff was discharged. *See Kariotis v. Navistar Intern. Trans. Corp.*, 131 F.3d 672, 677 (7th Cir.1997). Or they could show that, if the plaintiff and a substantially younger employee were both ranked "below the line," only the plaintiff was discharged. These examples illustrate the difficulties in mechanically applying the *McDonnell Douglas* approach in a case involving a large, simultaneous reduction in force.

**20.** These plaintiffs are also represented by attorneys Mark R. Waterfill and C. Warren Holland, both of whom are from Indianapolis, Indiana.

Martha L. Moore, James C. Norton, Cynthia Pate, Timothy Phillips, Stephen Plummer, Penny J. Rairden, Omar Scott, Sharon Simmons, Claudia Thomas, Birma J. Wilkerson, and Carol E. Wilson (collectively these twenty-seven plaintiffs are referred to as the "Waterfill Plaintiffs").[21] Among the Waterfill Plaintiffs are five plaintiffs whose claim of adverse treatment involves an alleged demotion, rather than an involuntary discharge. Those plaintiffs are Jon Hoy, Martha L. Moore, James C. Norton, Penny J. Rairden, and JoAnn Hinderliter.

The parties have dealt with the individual claims in two ways: in the aggregate, and individually. The plaintiffs' arguments in favor of finding a genuine issue of material fact for trial in the aggregate are no more availing than the arguments they used in the pattern or practice claim. First, they argue that the remarks made by Reiman and Jim Goetz, a director at Ameritech Services, Inc., sandwich and provide context for the resizing program, and that one year later IBT hired thirteen new managers under the age of forty. These facts constitute direct circumstantial evidence that defeats the summary judgment motion on the individual claims, the plaintiffs argue. As previously discussed, Reiman's comments do not provide evidence of discriminatory bias against older workers. Likewise, in the related case, the Court has already found Goetz's statements insufficient to create a factual issue about ASI's motivation, and will not revisit that decision here.[22] His remarks provide even less support for the plaintiffs' claims in this action. The subsequent hirings in 1993 are simply too remote in time and context to provide evidence of discriminatory intent. Consequently, the plaintiffs first argument does not prevail.

Plaintiffs add that the alleged pattern or practice as revealed in the statistical results of the selection process, demonstrate that the "plan was rigged to achieve the discriminatory result." Pls.' Brf. at 9. They argue that the statistics that show a disparate impact on older workers by the selection process, may be used in their individual cases to suggest that the process treated each of them differently because of their age. As the Court has already found, the experts' analyses of the statistical evidence are not trustworthy, and do not support the finding of disparate treatment on the basis of age. Likewise, the existence of disparate results, without more, cannot suffice to raise a genuine issue of material fact with respect to the defendant's motivation using the direct method of proving discrimination.

---

21. Five of these twenty-seven plaintiffs accepted re-assignments to non-management positions, which they claim to have done because they were told they were on the "at-risk" list. Their claims are the subject of a separate summary judgment motion filed on July 19, 1996, which will be resolved along with the individual discharge claims here. Those five plaintiffs are Jon Hoy, Martha L. Moore, James C. Norton, Penny J. Rairden, and Jo Anne Hinderliter. Two of these plaintiffs, Martha L. Moore and Paul Kirvan, have been discussed in the parties' briefing, but search of the Court's docket does not reveal their status as named or opt-in plaintiffs. Assuming that their omission from the docket was an oversight, the Court will consider their ADEA claims.

Seven plaintiffs have been dismissed from this action, and they are Jerry Asbrock, Edward Hollingsworth, Ronald Mote, Sheryl Neal, and Janet Webb, who were dismissed on August 4, 1994, and Cheryl D. Wilkinson and Clarence Young, on October 14, 1994. Finally, one plaintiff, Dale Cotterman, who joined as a party plaintiff in March 1995, was not discussed in the parties' briefing. He, therefore, presented no evidence regarding his claims against the defendant, and those claims are therefore dismissed.

22. Jim Goetz, ASI's Director of System Integration Services in the Information Technology Department made a statement about hiring people under the age of forty-five again. That comment was made during a videotaped discussion on September 10, 1993, between company executives and employees calling in from remote locations. ASI.' Exs. 125, 126 in Cause No. 93–420C. According to plaintiffs, Goetz's comment about hiring folks under the age of forty-five is a clear indication of age-related bias.

This Court has already found that the statement, considered in its context, did not provide evidence of age-related bias. *See Adams v. Indiana Bell Tel. Co., Inc.*, No. 93–420C, April 1, 1998, Order on Mots. To Strike and For Sum. J. at 60. It says nothing about terminating older workers because of their age, nor does it support the inference that the only people to be hired would be under the age of forty-five. *Id.* In addition, the statement was made more than one year after the decision to resize, and nearly ten months after the termination decisions affecting the plaintiffs. It was also made by someone who was remote from any of these decisions. *Id.*

Second, the plaintiffs employ the *McDonnell Douglas* burden-shifting method to prove their claims in the aggregate. They assert that IBT's arguments and evidence regarding whether they have satisfied their prima facie case "rest on a fundamental misunderstanding of *McDonnell Douglas*" and on factual statements that are in dispute. Pls.' Brf. at 20. According to the plaintiffs, "new and improved" performance expectations that have not been communicated to the employees cannot be used to determine whether they met prong two, satisfactory job performance, of the prima facie case. Citing *Gustovich v. AT & T*, the plaintiffs argue that the issue of new job expectations, and how a plaintiff compares to other employees with regard to those expectations, are part of the defendant's burden. Pls.' Brf. at 24; *Gustovich*, 972 F.2d 845, 849 (7th Cir.1992). In the plaintiffs' view, the criteria used during the ranking sessions represented new and different performance expectations that had not been communicated previously to them, making it improper to use their relative ranking as the basis for finding that they failed to establish prong two of their prima facie case. This theory is the equivalent of saying that IBT's use of new criteria reflected a desire to create a pretextual reason for each plaintiffs' discharge.

According to the plaintiffs, their prima facie case is not prevented by any allegation that they did not measure up as well against others during the resizing selection process. Because the Court has assumed, without finding, that the plaintiffs have met their prima facie case, this argument is moot. However, the Court notes that for it to concur with the plaintiffs' contention would be tantamount to saying that no employer may establish criteria for a downsizing selection process that differs from the evaluation criteria already in use. Presumably, those employees who do not measure up using the currently existing criteria will have already been discharged. When an employer must reduce the overall size of its workforce, many employees who are performing satisfactorily under existing criteria will lose their jobs. This means an employer must develop new criteria on which to base the downsizing decisions. As long as all of the similarly-situated employees are evaluated using the same methods and criteria, the employer has satisfied its obligation on this prong, and need not have communicated the new criteria previously.

In addition, many cases support the rule that to meet the fourth prong of the prima facie case, a plaintiff must show that he or she was treated less favorably than a "similarly situated," substantially-younger employee. *See Fisher*, No. 97–2354, slip op. at 6; *Hartley*, 124 F.3d at 892; *Testerman*, 98 F.3d at 304 (noting that the ADEA protects the "imperfect older worker" from worse treatment than the "imperfect younger one."). Consequently, the basis of comparison here for determining if another employee was similarly situated would include whether the other employee was placed on the "at risk" list, what skills that employee possessed, and how that employee ranked against his or her peers during the ranking sessions. *See Testerman*, 98 F.3d at 304; *Gustovich*, 972 F.2d at 848. Because the plaintiffs have no evidence of the relative skills and performance of their coworkers, other than their own opinions, they would have failed to create a genuine issue of material fact on this prong of the prima facie case as well.

Again, assuming that plaintiffs established a prima facie case, the second step of the indirect method is for IBT to come forward with a legitimate, non-discriminatory reason for the plaintiffs' discharges. According to the plaintiffs, IBT's explanations are not sufficiently specific to meet its burden at step two, and the reasons are not tied to the employment decisions at issue. The plaintiffs accuse IBT of merely saying that they were "relatively poorer performers," which is so vague that the plaintiffs cannot discredit the reason with specific evidence. Indiana Bell, the plaintiffs contend, has made bare, conclusory assertions that the plaintiffs were among the worse performers, without backing it up with specific facts. Pls.' Brf. at 31. The specific facts the plaintiffs seek include a "direct comparison between the fired and not-fired groups." *Id.* However, such a presentation is not necessary to satisfy the defendant's burden, which is a burden of pro-

duction, not persuasion. *Mills*, 83 F.3d at 845.

Plaintiffs have confused the cases that require an employer to explain why one employee was fired over another, with the situation at hand in which the reason any given employee was terminated is that he or she was evaluated by a group of managers using criteria equally applicable to all and was found to be less valuable to the company than similarly-situated co-workers. *See Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1162 (7th Cir.1994). Under these circumstances, the degree of specificity a defendant needs to articulate to shift the burden to a plaintiff is measured by how detailed, specific, and neutral the process was for selecting employees for termination. IBT has pointed to documents recording the results of the various ranking committees' work, affidavits from managers who were familiar enough with each plaintiff's work and ranking to explain the rank each received, or both. That is sufficient to shift the burden of production to the plaintiffs. The Court sees no need for defendants to further recount the specific reasons that went into the ranking group's decisions.

The workforce resizing process IBT has described was as comprehensive, fair, and unbiased a system as they could make it. A mechanical process, using historical data collected before any resizing was contemplated, assigned numerical scores to each employee for purposes of appraising past performance and management skills. *See* Def.'s App. Vol 5, Tab 3, "McFeeley Aff." ¶ 19–25. An employee's score would determine whether he or she joined the list of employees at risk of termination.[23] *Id.* Next, those on the at-risk lists were grouped according to salary grade and evaluated by eight different committees of higher-level managers, each of whom had only one vote, and none of whom either knew or considered the ages of those being ranked. *Id.* ¶¶ 33–39. They also did not know where the ultimate line would be drawn for their ranking group.

This non-mechanical evaluation was performed in numerous steps. *Id.* Additional audits were conducted during the ranking process to ensure that no substantial disparity existed between an employee's ranking by the group, and his or her relative ranking from the mechanical process. *Id.* ¶ 35. Members of the ranking committee numerically rank-ordered all of the employees on their list, from lowest to highest. *Id.* ¶ 37. Once the ranking was completed, the ranking committees were finished. *Id.* ¶ 39. The lists proceeded to the hands of IBT's corporate officers, who had to decide how many managers in each salary grade to cut. *Id.* ¶ 40. The officers did not change any rankings, nor did they consider age, years of service or pension status, when deciding where to draw the lines. *Id.* ¶ 41.

The Court finds that IBT has produced a sufficient non-discriminatory explanation for the plaintiffs' terminations, which shifts the burden to the plaintiffs to show pretext. *See Robinson*, 23 F.3d at 1164 (defendant's reliance on a forced ranking of employees being considered for discharge during a RIF "does not hint of age discrimination"). In *Robinson*, the plaintiff had argued that the criteria used in the forced ranking were unfair to him, masking his strengths and highlighting his weaknesses, but the court found that argument irrelevant. *Id.* Even if a forced ranking results in a "mistaken assessment" of an employee's value to the company, it said, that fact alone does not "signal cognizable discrimination by the company." *Id.* "Misguided and unfair personnel assessments are not actionable under the ADEA unless age played a role in the evaluation." *Id.*; *see also Testerman*, 98 F.3d at 304 (at issue is not the wisdom of the employer's decision, but the genuineness of the employer's motives); *Gustovich*, 972 F.2d at 848 (mistaken or incorrect ratings are not age discrimination).

The burden shifted to the plaintiffs, to show that the stated reason was not the real reason. To meet that burden, the plaintiffs assert that IBT "made up" performance defi-

---

**23.** Some exceptions to this general summary occurred. *See* Def.'s App. Vol. 5, Tab 3, McFeeley

Aff. ¶¶ 26–32.

cits after it decided to fire them, a fact that is supported by the absence of any of these deficits in prior evaluations. Specifically, plaintiffs argue that because these alleged deficiencies were not mentioned to them while they were employed, they are of "recent vintage" and should be viewed with "extreme suspicion." Pls.' Brf. at 35. They also argue that the "post-hoc justifications" advanced by IBT are pretextual because at the time of the dismissals IBT president, Reiman, stated, "these are not poor performers for the most part." See Pls.' Ex. 109. Finally, the plaintiffs point out that during discovery they were unable to obtain "plausible explanations" from IBT for any given plaintiff's selection over that of a younger worker. Pls.' Brf. at 36.

Plaintiffs' arguments and "evidence" fail to demonstrate that IBT did not honestly believe that it had developed a fair and objective system for evaluating its employees to decide which ones to ask to leave. With respect to their accusation of recent fabrication because IBT had not mentioned the alleged deficiencies to them before, the plaintiffs are mistaken. First IBT decided it needed to reduce the size of its workforce, then it devised a process for assessing the relative strengths of its employees, based on available information and criteria that IBT considered necessary in the newly competitive environment it faced. Only after it made these two decisions did IBT evaluate its entire workforce using the newly-devised selection process. It makes no sense that IBT would have had the prescience in 1990 or 1991 to incorporate the criteria being used during the 1992 resizing program in its routine annual evaluations. Plaintiffs' expectations to the contrary are unrealistic.

Another reason the plaintiffs believe that IBT's reasons were a pretext is that at the time of the actual terminations, Reiman allegedly stated that those who would be cut are not "poor performers." This statement might have created a material issue of fact if IBT were now saying that the plaintiffs were terminated because they *were* poor performers. However, that is not what has been stated. Instead, IBT has explained its detailed and comprehensive selection process,

the criteria used for mechanical and non-mechanical rankings, and has supplied information about how each of the plaintiffs ranked using that system in relation to the other employees on the at-risk list for their salary grade. For the plaintiff to suggest that IBT is now merely stating that they were poor performer is disingenuous. Plaintiffs were ranked against their peers, and each one of them ranked lower than those who were retained. It is as simple as that.

Finally, the plaintiffs attempt to create an issue out of the fact that, during discovery the defendant did not provide them with a "plausible explanation" for plaintiffs' selection for termination. In support of that contention they cite IBT's answers to interrogatories. See Pls.' Exs. 229, 230. Again, the Court must remind the plaintiffs that the reason they were selected for termination is that they ranked relatively less well than their peers in terms of the criteria being used to select employees for termination. In addition, the first interrogatory asks for information, the identity of any person with knowledge of the listed inquiries, and the "substance of their knowledge." The list of inquiries included everything from "the job performance and ability to perform the duties" of twenty-two named plaintiffs, to "discussion about, reference to, or consideration of" any of those named plaintiffs "concerning his or her termination from employment" or demotion. Pls.' Ex. 229. Aside from the fact that the latter inquiry is confusing, the information requested in writing appears to have been extensive. Rather than take a statement from each of the relevant managers in possession of this information, IBT simply provided the plaintiffs with the name of the persons who had knowledge of the employee's rank, capabilities, and the process used for ranking him or her. That is not the same thing as refusing to give a plausible explanation for the terminations. Plaintiffs' final argument in support of pretext in the aggregate likewise fails.

As already noted, plaintiffs have presented no evidence that the system itself was tainted or biased against them because of their age. Instead, it selected them because their performance under the WRP ranking criteria

was not as strong as the performance of those against whom they were compared. The law does not require an employer to do anything more under the circumstances than what the defendants did. *See Kariotis,* 131 F.3d at 677 ("no federal rule requires just cause for discharges.").. Defendants appeared to have made every effort to ensure the fairness of their selection system and they monitored application of the process to see that the rules were being followed. They included several checks to make sure that the system was not being used to target workers who were in protected classes, and they documented the results of those assessments. It was enough.

Plaintiffs' individual attempts to "cast doubt" on the defendants' stated explanations of why they were selected likewise come to naught. With evidence as strong as that provided by the defendants, a plaintiff must come forward with equally strong evidence of a lie to rebut it. They have not. Plaintiffs devote more than forty pages of their brief to show why the defendants' justification for each of their terminations was pretextual. The evidence they offer includes their own testimony (by deposition or declaration), prior performance evaluations, an occasional list of awards or commendations, and each plaintiff's own assessment of his or her value to the company in comparison with others. However, the question is not whether the plaintiffs had been performing satisfactorily, it is whether IBT honestly believed that each was selected for termination because he or she was among the weakest members in the relevant ranking group. *See Sirvidas,* 60 F.3d at 378.

For that reason, "general averments of adequate performance by [the employee] are ordinarily insufficient to create a factual issue on summary judgment." *Id.* In fact, a claim that the employer acted incorrectly,

undesirably, or even unfairly, toward the employee will not show that the employer did not honestly believe in the reasons for the discharge. *See Giannopoulos v. Brach & Brock Confect., Inc.,* 109 F.3d 406, 411 (7th Cir.1997); *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir.), *cert. den.,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996); *Kariotis,* 131 F.3d at 677. If the evidence shows that the defendant "honestly believed in the nondiscriminatory reasons it offered, even if those reasons are foolish or trivial or even baseless," then it cannot support a finding of pretext. *Hartley,* 124 F.3d at 890.

Nearly all of the plaintiffs offer similar evidence about the "real" reason they were discharged. The Court notes that most of it consists of the plaintiffs' performance ratings prior to the decision to resize, allegations that they were ranked by managers who did not directly supervise them, that they were selected for termination based on concerns that had never been voiced to them, and their opinions that they were more qualified than younger co-workers who were retained. The plaintiffs also emphasize that rankers were instructed to destroy their notes taken during a ranking session, which plaintiffs suggest demonstrates an unlawful motive behind their actual rankings.

Initially, the Court observes that the plaintiffs' citations to statements and ratings on previous annual performance evaluations, without more, are irrelevant to the issue of whether their relative ranking during the WRP process was motivated by discriminatory animus. *See Sirvidas,* 60 F.3d at 378. This argument ignores the fact that the defendants had to choose from among many employees with similarly good annual ratings, to select those who were the least satisfactory, or weakest, for termination.[24] It also overlooks the fact that a given employ-

---

24. The plaintiffs also assert that defendants' explanations were not specific enough to allow the burden to shift back to them to show pretext. This argument is another example of the poor fit between the *McDonnell Douglas* framework and a large RIF. The Court considers the defendants' evidence, in the form of affidavits describing the process used and the reasons for each plaintiff's selection, in the context of the WRP. The WRP process involved very specific criteria by which each manager being evaluated was rated. Those ratings were performed by a group of managers, many of whom were familiar with the employee's work, in an environment in which the rankers' decisions were being monitored for fairness and absence of disparate impact on protected classes of workers. In light of the decentralized process actually used, the plaintiffs' assertions just do not add up.

ee's performance, or the perception of his or her performance, may change over time, and an earlier rating of "substantially exceeds expectations," may not negate that employee's placement below the line in 1992. An employee could meet, or even exceed job objectives, and still be a difficult person with whom to work, or someone averse to change. *See e.g.* Def.'s App. Vol. I, p. 71, Jochum Aff. ¶ 3 (noting that Allard, with a "meets objectives" rating, "performed satisfactorily in her niche," but was "not very forceful and exhibited weak managerial skills."); Def.'s App. Vol. I, p. 118, Klingerman Aff. ¶ 5 (noting that Bostrom was a solid average performer who "was sometimes abrasive when dealing with others."); p. 128, Klingerman Response to Appeal (agreeing with Bostrom's assessment regarding his skills, experience and knowledge, but noting that "had it been otherwise, his employment status would have been in jeopardy long before.").

It was not uncommon for the employees in the "at risk" pool to have received the average, or satisfactory, rating at IBT: "meets objectives." In fact, in response to Bostrom's contention that he received lower evaluations than he should have due to his former supervisor's unwillingness to support his employees, Klingerman provided historical data for that district. From 1987 to 1990, the thirteen to sixteen subordinates of Hal Rees received performance ratings from five to three, on a scale of one (lowest) to five (highest). Def.'s App. Vol. I, p. 126, 129. Bostrom's consistent rating of three explains why he was on the at-risk list. Other employees may have received satisfactory ratings, lump sum merit awards, and a management rating of "promotable," yet under closer scrutiny they exhibited characteristics that made them less desirable as an employee in the streamlined company. *See e.g.,* Pls.' Ex. 74, Bush Decl., ¶ 4, Att. A, Bush Development Profile.

Bush is one of them. She argues that she told the person who ultimately represented her in a ranking session that she was very close to becoming eligible for her service pension, and she would like to "ride out" the resizing. Pls.' Brf. at 41; Pls.' Ex. 74, Bush Decl. ¶ 9. The other reasons she cites for a finding of pretext are that the "statistics for her salary grade are stark indicators of discrimination," she had received individual merit bonuses in 1990 and 1991, in mid–1991 she was rated as promotable, and her supervisor's comments about her performance that appear to be consistent with the criteria IBT used for making its decisions. Pls.' Brf. at 42. Bush notes that she was described by her supervisor as a "take charge individual," which she believes is a leadership quality IBT claimed it was seeking in those it retained. *Id.* at 43. What she overlooks is the fact that her style of taking charge was considered by her superiors to be detrimental to good teamwork. Pls.' Ex. 75 at 020336.

When IBT decided it had to "reduce the overall size of the pie" rather than just determine how to cut it up, problems like Bush had became more significant. Even at the time it was made, the "take charge" comment was not wholly positive. Bush's supervisor added that sometimes Bush's behavior "causes friction within the group," and that in her attempt to "get things done," she sometimes appeared to take over the projects of others. *Id.* Acknowledging that Bush's motives may have been good, the supervisor noted that "this does not always contribute to good teamwork within the office." *Id.* Another comment in the 1991 evaluation that portends her future assessment during the resizing was that Bush was "very protective of 'her' team and 'her' projects and sometimes downplay[ed] the importance of other team's [sic] projects and activities." *Id.* After this appraisal, Bush was asked to create an action plan to remedy her interpersonal deficiencies. Def.'s App. Vol. I, pp. 155–56, Bush Dep. at 91–92.

During 1992, Bush had some more difficulties with her co-workers and subordinates, and she was told by one of her superiors that her staff was upset with her for the way she handled a project, and that she should apologize to them. Def.'s App. Vol. I, p. 158, Bush Dep. at 102–03. This same supervisor had recently taken over the department in which Bush worked, and she had a "new style of management." *Id.* at 140. According to Bush, this new supervisor wanted creative ideas, innovation, and she wanted them to

"do things by teams." *Id.* This management style contrasted with the previous culture, which Bush described as the "old tradition," in which the staff would provide information to the supervisor, and the supervisor would tell them what to do about it. *Id.* The new supervisor's style was the reverse. *Id.* None of Bush's evidence supports a finding that the relatively lower ranking she received during the ranking process of the WRP was a pretext for age discrimination. Instead, her own testimony provides evidence that supports her supervisor's assessment of her as "not empathetic" to her staff, as the creator of strife among staff and peers "by taking credit for things she had not done," and as having interpersonal problems with her co-workers. *See* Def.'s App. Vol. I, p. 182, Herald Aff. ¶¶ 4, 6.

The Court sees no need to document its review of each of thirty-five plaintiffs' evidence and arguments. Rather, it is enough to mention a few of the more compelling arguments and explain why they do not create a genuine issue of material fact for the jury. Just like Allard, Bostrom, Bush, and Mills, none of the other plaintiffs have succeeded in creating a genuine issue of material fact, or proving that their particular termination was because of age.

Plaintiff Paul Bostrom ("Bostrom") argues that because he received lump sum merit awards for his 1990 and 1991 performance, and because his Ameritech Development Profile in 1992 "rated him as exceeding objectives in overall managerial competency, leadership, organizing and planning, oral and written communication, customer quality/focus, and knowledge of the business," he should not have been selected for termination. He also states that his supervisor told him in early 1992 that he was very close to being rated as "exceeds objectives," instead of "meets objectives," on his annual performance evaluation. Pls.' Ex. 94, Bostrom Dep. at 40–41, 62–63. Each of these

facts, Bostrom claims, should have placed him outside of the pool of "at risk" workers. As further evidence of pretext, Bostrom states that during his exit interview, when he asked why he had been terminated, he was told that he had "done a wonderful job here," and that he had "great knowledge in this area." Pls.' Brf. at 40. Finally, according to Bostrom, he was replaced by an employee who was ten years younger than him. *Id.* Bostrom believes that these facts eliminate all non-discriminatory motives for his firing, making it likely that IBT selected him because of his age.

The problem with Bostrom's submissions of evidence, and one that is common among most of the plaintiffs, is that he points to indicators of his performance at a time before IBT decided to resize, as if they should have insured him against selection for termination. This belief about the resizing situation reflects a very subjective view of the law. At the time of his previous evaluations, IBT was in a "business as usual" mode. When he was evaluated in connection with the WRP, IBT was faced with choosing who among all of its "average" performers should be let go. Very fine distinctions had to be made between one manager with a rating of "three," a $1,000.00 merit award, and a 98% salary target, and another with the same or similar ratings. None of Bostrom's evidence creates a genuine issue of fact about pretext.

Plaintiff Richard A. Mills ("Mills") has alleged that he was the victim of age discrimination at the hands of a younger supervisor, Bob Knowling ("Knowling"), who became the district level director for business customer support, where Mills worked in February of 1992. Pls.'s Ex. 128, Mills Dep. at 37, 86–88. Mills's friend and former supervisor, Ed Hollingsworth ("Hollingsworth"), allegedly provided Mills with information leading him to believe that Knowling unduly influenced his ranking.[25] *Id.* at 86–88, 135. Mills states

---

**25.** Despite Mills's contention that Hollingsworth told him that Knowling wanted him out of the company, Hollingsworth's testimony was complimentary to Knowling. Specifically, he reported that Knowling "encouraged risk-taking," and was "creative in the way he dealt with appraisals, salary treatment, awarding incentive compensation." Pls.' Ex. 130, Hollingsworth Dep. at 94. Knowling was also "direct in the way he communicated." *Id.* After describing the "utility mind set of management" from the days of being a regulated monopoly, Hollingsworth contrasted Knowling's style. *Id.* at 96. "One of the elements of baggage from the past was you didn't

that Hollingsworth was aware of the fact that Knowling wanted Mills "out at Indiana Bell." *Id.* at 86–88. According to Hollingsworth's testimony, Knowling did not think that Mills was doing a good job with a large and important account, the Indiana Lottery Commission (the "Lottery"), and he said so. Def.'s App. Vol. II, p. 927, Hollingsworth Dep. at 88. In fact, from March to approximately July of 1992, every time Mills' name was mentioned in a conversation between Knowling and Hollingsworth, Hollingsworth had to defend Mills' Lottery performance. *Id.* at 92. Sometime in July or August of 1992, Knowling informed Hollingsworth that Mills' job with the Lottery had been re-classified from a Level 2–2 (Salary Grade 4) to a Level 1–1 (Salary Grade 3). *Id.* at 115. No reason was given for the change. *Id.*

Subsequently, Knowling asked a group of his Salary Grade 5 managers to review the Salary Grade 3 managers on the at-risk list, and indicate which ones should be in the bottom ten percent in terms of performance. Pls.' Ex. 131, Williams Dep. at 98. Mills's name was not on that list of Salary Grade 3 managers. Hollingsworth Dep. at 116. However, it was on the list of Salary Grade 4 managers that Knowling received from the Human Resources Department after the mechanical ranking process. Def.'s App. Vol. 2, p. 949, Knowling Dep. at 66. Once the group of Salary Grade 5 managers had determined the bottom ten percent, Knowling joined the group and expressed his opinion that Mills's recent performance warranted placing him among the group of poorer performers. Williams Dep. at 102–03. After discussion on the subject, nine out of the eleven upper level managers agreed with Knowling. Def.'s App. Vol. 2, pp. 935–36, Hollingsworth Dep. at 116, 119; pp. 1063–64, Knowling Aff. ¶¶ 6–7.

Mills has no reason to, and does not, believe that he was placed on the "at risk" list because of his age. Def.'s App. 2, pp. 1040–41, Mills Dep. at 50–51. He does, however, believe that he was ranked and selected for termination because of his age. *Id.* at 54–56.

The sole basis for that belief is the ages of those who were selected. *Id.*

Allard, Bostrom, Bush and Mills are Rose Plaintiffs, and their evidentiary submissions reflect many of the same short-comings, the hallmark of which is a subjective view of the facts and the law. Among the Waterfill plaintiffs, the Court noted similar weaknesses. One example is that of John Clarke, a fifty-five year old manager at the time he was discharged. Pls.' Ex. 139, Clarke Decl. ¶ 3. He had been employed at IBT for twenty-seven years, and his performance evaluations for 1990 and 1991 were "satisfactory." *Id.* ¶¶ 2, 4. In 1991, he was told that he did not receive a lump sum merit award for 1990, because he was new to his department and not well-known. *Id.* ¶ 5. He was not told that it was because of his performance. *Id.* At no time was he ever told he was a "marginal" performer. *Id.* ¶ 4. From November 1990 to March 1992, Clarke worked on a project that required his presence in Chicago during the workweek, and he believes that his willingness to leave his family every week for fifteen months demonstrated outstanding commitment to IBT. *Id.* ¶ 6. He also states that the manager who represented him during the ranking sessions, Brad Ballentine, had not actually supervised him after November 1990, and in fact had "little or no contact," with him. *Id.* ¶ 8. According to Clarke, Ballentine spent so little time with him that he was unable to assess Clarke's performance accurately. *Id.* ¶ 7. Finally, Clarke maintains that he was replaced by a thirty-eight year old manager with less knowledge and experience than Clarke. *Id.* ¶ 9.

During his deposition, however, Clarke admitted that he did not know how his peers were evaluated during this period of time, nor whether they received lump sum merit awards. Pls.' Ex. 140, Clarke Dep. at 47. He offered nothing other than his bare assertion that he was replaced by a substantially younger manager, with less supervisory experience. Before Clarke was moved to the new project in Chicago, he had been super-

---

want to hurt anybody's feelings. So you tended to over rate people, generally, so that when you had appraisal feedback you could be nice." *Id.* at 96–97. Knowling, on the other hand, did not

tolerate anything but candor during appraisal sessions, and he differentiated "in meaningful ways top performance from average performance." *Id.* at 97.

vising six people at the management level, but when he joined the new project he no longer supervised anyone. *Id.* at 48–49. Rather, he was part of a regional team exploring the idea of consolidating minicomputers in the region. *Id.* at 50. He does not recall getting a written evaluation for 1991, but he does recall being evaluated at the same level as the year before, and he did not receive a lump sum merit award. *Id.* at 52. Clarke does not contend that either of his evaluations or lump sum merit award determinations were based on age. *Id.* Instead, the sole basis for his discrimination claim is the fact that ninety-five percent of those who were selected for termination were over the age of forty. *Id.* at 63, 87. Although Clarke contends that similarly-situated, substantially-younger employees were treated more favorably than him, he has no personal knowledge of that fact, other than that the people he named were not selected for termination. *Id.* at 97–98.

Ballentine, who supervised Clarke and represented him at the ranking session, states that Clarke was a "lackluster performer" whose performance in 1992 had slipped into a less than satisfactory range. Def.'s App. Vol. 1 at 206, Ballentine Aff. ¶ 3. The facts supporting this evaluation are that Clarke reported to Ballentine, who had personal knowledge of Clarke's performance, had observed him and considered Clarke to be a marginal performer who lacked commitment. *Id.* ¶¶ 2, 3. To dispute these facts, Clarke has offered his own opinion about his performance and commitment, and the fact that he spent fifteen months away from home, doing the Chicago project. However, at no time has Clarke stated that he volunteered for, or had a choice regarding, the Chicago project. Instead, it was part of his job to take the assignment, and cannot serve as evidence of commitment to counter his supervisor's observation of a lack of same.

From an objective standpoint, the fact that Clarke had previously supervised six managers in Indianapolis, makes his Chicago assignment look like a step down. By his own testimony, the assignment to be a member of a team working on a regional project involved no supervisory responsibility. For Clarke to now argue that he compared favorably in 1992 to others who continued to handle supervisory responsibilities is useless. Clarke has offered no evidence of any accomplishments, recognition, or special skills that would have earned him a higher rating during the ranking sessions. Even more importantly, he has no evidence that Ballentine or anyone on the ranking committee that evaluated him, selected him on the basis of his age. Clarke has failed to submit any evidence from which the Court could discern an issue of fact for trial.

Sharon Simmons ("Simmons") is another example of how the Waterfill plaintiffs attempt to show pretext. Simmons was a forty-eight year old training associate at the time of her discharge, and she had worked for Indiana Bell for twenty-six years. Pls.' Ex. 222, Simmons Decl. ¶ 2, 3. For 1990 and 1991, she had earned satisfactory performance evaluations, with a lump sum merit award for her 1990 performance. *Id.* ¶ 4. In her declaration, Simmons listed several other awards she had received, including a department award just a few weeks before she was terminated. *Id.* She also indicated that she enjoyed her job, "was very good at training and wanted to continue." *Id.* ¶ 6. Another training associate in Simmons' work group, was a "college graduate in her thirties," and she was retained by IBT. *Id.* ¶ 7. Simmons claims that this person "never did any training," and Simmons was required to perform all of the technical training. *Id.* Simmons does not mention whether she has a college degree, but the omission suggests that she did not.[26]

---

26.  Simmons also states that she was "informed by individuals still employed by Indiana Bell," about a college graduate in his late twenties who took over some of Simmons' duties after she was discharged. Simmons Decl. ¶ 8. The problem with this contention is that Simmons does not identify the individuals who so informed her, has presented only unreliable hearsay as to that fact,

and offers a possible basis to distinguish this employee (his college degree). In addition, when a company reduces the size of its workforce, many tasks previously performed by a discharged employee will be absorbed by the remaining employees. *See Collier v. Budd Co.,* 66 F.3d 886, 890 (7th Cir.1995). This fact alone

Finally, Simmons declares that she had requested a performance appraisal at the end of 1992, because she believed that she had performed exceptionally well that year. Simmons Decl. ¶ 9. She was told by her supervisor that she would not receive an appraisal for that year, but she was subsequently terminated on December 31, 1992.[27] Simmons maintains that a 1992 review was performed, but not until after she became a party to this litigation. Simmons Decl. ¶ 9. She provides no evidence of that fact other than her bare assertions. That is also the extent of her evidentiary support for the claim that she was terminated because of her age. While she admits that none of her previous performance evaluations, management skills assessments, or lump sum merit award determinations were based on age, she subjectively believes that her selection from the at-risk list was because of her age. The reasons she offers for this belief include her own opinion about the performance and experience of her peers, the fact that she had not been told she lacked transferable skills, and Reiman's comment about selecting those who least had skills for the future.

By her own testimony, most of these reasons are discredited. First, she admits that she knew nothing about how her coworkers were rated during their performance evaluations, or whether they received lump sum merit awards. This fact demonstrates a lack of any objective basis for her subjective beliefs about them. Second, as with other plaintiffs, Simmons' statement about not being told previously about her deficiencies misses the point. Indiana Bell decided to reduce the size of its workforce and it developed criteria with which to determine whom to discharge. The ADEA does not prohibit an employer from doing this. In fact, even "misguided and unfair personnel assessments are not actionable under the ADEA unless age played a role in the evalua-

tion." *Robinson*, 23 F.3d at 1164. Simmons has specifically testified that age did not play a role in her prior evaluations. Instead, she merely states her belief that she was selected from the at-risk list because of her age.

In an apparent contradiction, Simmons stated that it was her understanding that those on the at-risk list were not there because they were poor performers. Def.'s App. Vol. 4, Simmons Dep. at 65. If so, then she should have understood why she had not previously heard about her shortcomings. She also must have understood that something other than the ordinary performance evaluation criteria would have to be used for selecting employees for termination. Nothing in the ADEA prevented Indiana Bell from developing different criteria for the resizing program, as long as age was not a factor. In the absence of an employment contract, Indiana employers have the right to discharge any employee without cause, unless the reason is the employee's age, sex, race, or other protected characteristic. *See Jarboe v. Landmark Comm. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 121 (Ind.1994) (essence of employment-at-will doctrine is that employment contract is "presumptively terminable at the will of either party.").

Finally, Simmons states that comments made by both Reiman and Weiss reflected age bias, in that they mentioned "growth potential" and "skills for the future." Def.'s App. Vol. 4, Simmons Dep. at 69. She interpreted these comments as age-related bias because "the older you are the less time you have to work on that growth potential." *Id.* at 71. With respect to skills for the future, Simmons states, "I took that to mean, you know, the younger college graduates that were coming in ... with more skills for the future because they were younger and they had college degrees ...." *Id.* In her view, many older workers did not have college degrees, so the comment must have meant

does not present a material fact the dispute of which would prevent summary judgment.

27. Simmons had learned that she was on the at risk list and decided to take a voluntary early retirement, picking December 31, 1992, as her date of retirement. Def.'s App. Vol. 4 at 1890–91, Simmons Dep. at 107–08. She understood

that she still had the option to revoke that decision. *Id.* at 111. When December 31, 1992, came, Simmons decided to revoke her retirement, causing Indiana Bell to review the selection list to see if she had been selected for involuntary termination. *Id.* She had, and she was terminated the same day.

that Indiana Bell planned to get rid of older workers. *Id.* Upon further questioning, Simmons admitted that some younger people may not have skills for the future either. *Id.* at 73. She also conceded that neither Reiman or Weiss related their comments to older workers, even though that was how she interpreted them. *Id.* at 74.

Simmons equated skills for the future with being better educated, and being better educated with being younger, which is how she came to her understanding that these two comments reflected age bias. *Id.* at 74–76. She also acknowledged that there had been a culture change at Indiana Bell, without realizing how that explains so much of what happened to her. *Id.* at 70 ("Everything was changing."). The Court finds no support in any of this evidence for Simmons' attempt at proving pretext.

A discharged employee who claims discrimination may not avoid summary judgment by asserting that she was qualified for her position. *See Collier,* 66 F.3d at 893. She must instead create some doubt about the employer's motives, either by specifically refuting the facts that support the employer's proffered reasons, or by showing that the employer did not honestly believe those reasons. *Id.* Here, Allard, Bostrom, Bush, Mills, Simmons and Clarke, and the other Rose and Waterfill plaintiffs like them, have done neither. The motion for summary judgment on the plaintiffs' individual claims of age discrimination should be GRANTED.

### C. Individual Demotion Claims

■ As noted previously, five of the named Waterfill plaintiffs believe they were demoted to non-management positions during the WRP, and that such adverse action was taken because of their age. Those plaintiffs include Jon Hoy ("Hoy"), Martha L. Moore ("Moore"), James C. Norton ("Norton"), Penny J. Rairden ("Rairden"), and JoAnn Hinderliter ("Hinderliter"). Their ages and years of service at the time of the

alleged demotions were as follows: Hoy, forty-eight with twenty-two years of service, Pls.' Ex. 186, Hoy Decl. ¶ 2; Moore, forty-three, years of service unknown, Pls.' Ex. 207, Moore Decl. ¶ 2; Norton, forty-three, with twenty-three years of service, Pls.' Ex. 209, Norton Decl. ¶¶ 2, 4; Rairden, forty-four with more than twenty-five years of service, Pls.' Ex. 219, Rairden Decl. ¶ 6; and Hinderliter, forty-six with twenty-one years of service, Pls.' Ex. 178, ¶ 4.

The gist of each of these plaintiffs' claims is that when they learned they were on the at-risk lists and facing possible termination, they became discouraged by comments from their supervisors (or their refusal to comment), and decided to apply for a transfer to a "craft" position. In each case, the craft position involved a reduction in pay and benefits, which is why the plaintiffs believe they were demoted. Their theory of liability, however, overlooks the choice they had in the matter, and recharacterizes their voluntary decisions as demotions. According to these plaintiffs, they were given a choice between being fired or being demoted, with a substantial cut in pay and benefits.[28] In a subsequent permutation in the plaintiffs' brief, the choice became "retire or be fired." Pls.' Brf. in Oppos. at 10.

That statement came in the portion of the brief in which the plaintiffs tried to distinguish a case cited by the defendants regarding what is or is not a voluntary decision to take early retirement. *See Henn v. National Geographic Society,* 819 F.2d 824 (7th Cir.), *cert. denied* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). In *Henn,* the court was sorting out whether an early retirement package that National Geographic offered to its advertising sales representatives, who were age fifty-five or over, constituted age discrimination. *Id.* at 826. The court analyzed the issue in terms of whether the options presented would make the recipient of

---

28. Another example of counsel's subjective presentation of the facts is found in this argument. Plaintiffs Hoy and Hinderliter did not experience a substantial cut in pay. Rather, Hoy, who had been making approximately $38,000.00 annually took a position that paid $37,000.00. Def.'s App. at 35–36, Hoy Dep. at 6–9. Hinderliter was making approximately $45,000.00 annually before she took a reassignment, and afterward she made approximately $41,000.00 a year. Def.'s App. at 4, Hinderliter Dep. at 5.

the offer better or worse off.[29]   In that context, the court wrote that if "the employee may decline the offer and keep working under lawful conditions, the offer makes him better off." *Id.* The court concluded that when "one option makes the recipient better off, and the other is the status quo, then the offer is beneficial," and does not violate the ADEA. *Id.*

The plaintiffs rely on this case to support their contention that factual issues exist regarding whether their decisions to apply for reassignment were actually voluntary.   According to the plaintiffs, "the gravamen of [their] claim is that Bell placed them in a position where they had to choose between being fired and taking a demotion and pay cut, and that it did so on the basis of their age." Plfs.' Brf. in Oppos. at 7. Assuming that they have already created a factual issue about whether Indiana Bell's treatment of them was because of their age, the plaintiffs argue that the defendant has not even attempted to negate their prima facie case. This argument is without merit.   The Court has found, and sees no reason to modify its finding, that the plaintiffs have failed to provide sufficient evidence to create a genuine issue of material fact about the motivation behind or causation of the resizing or any individual termination decision.

Yet, even if the plaintiffs could show that their ages prompted IBT to present them with the choice of reassignment, they would still stumble over the voluntariness issue. When asked what it was about their reassignment that made them feel it was a demotion, each plaintiff responded that it was because they took a cut in pay and benefits. They overlook an important aspect of demotion, which is that it must be involuntary, or it cannot be an "adverse employment action" taken by their employer because of their

protected characteristic.   Using the case cited by both parties on this issue, the Court finds that the "status quo" in this instance was not the plaintiffs' previous status before IBT's decision to resize.   Rather, it was the situation ·they and every other employee faced once that decision was made.   The "status quo" for each plaintiff depended on how they fared in the WRP selection process.

Contrary to the argument propounded in their brief, the plaintiffs testified that they knew that being on the at-risk list did not mean automatic termination. *See* Def.'s App. Ex. 1, Hinderliter Dep. at 38;  Hoy Dep. at 85, 102, 118, 120–23;  Moore Dep. at 28, 41–42, 48–49;  Norton Dep. at 69–70;  Rairden Dep. at 56–57, 69–71.   Each of these plaintiffs has bolstered his or her deposition testimony with subsequent declarations regarding their perceptions that they were essentially given a choice between termination or demotion. *See* Pls.' Ex. 178, Hinderliter Decl. ¶ 9; Ex. 186, Hoy Decl. ¶ 9;  Ex. 207, Moore Decl. ¶¶ 12, 13;  Ex. 209, Norton Decl. ¶ 11;  Rairden Decl. ¶ 5. To the extent that those "perceptions" conflict with their deposition testimony, they are inadmissible.[30]  *See Russell v. Acme–Evans Co.,* 51 F.3d 64, 67–68 (7th Cir.1995).   However, even if admissible, the declarations do nothing more than give each plaintiffs' interpretation of what was being told them.

As with much of the facts presented in this case by the plaintiffs, their perceptions have been highly subjective, and therefore do not create a genuine issue.   The plaintiffs understood that only a small percentage of the hundreds of employees on the at-risk list would be selected for termination.   They had a choice between two alternatives:  do nothing and take their chances on being selected for termination, or apply for reassignment to a craft position, with less pay and benefits,

---

**29.**  This Court is cognizant of the fact that it is not obligated to reach the issue of whether the options presented make the employee better off until it appears that the decision to give the options was motivated by age.   In *Henn,* that finding was obvious.   The early retirement offer only went to sales people who were at least age fifty-five, a discrimination based on the age of the recipient. *Henn,* 819 F.2d at 826.   Here, there is no evidence that the option of applying for reassignment was only presented to employees who

were a certain age.   Instead, the offer was open to all managers in Salary Grade 3 and below. Def.'s App., Ex. 1, Hoy Dep. Ex. 3, September 22, 1992, *Highlights.*

**30.**  In fact, Moore admitted in her deposition that she specifically asked about the possibility of being reassigned once she learned she was on the at-risk list.   Moore Dep. at 33.

but more job security. They chose the latter.

The Court has found no evidence to support their subsequent claims of coercion. In fact, Hoy specifically said he knew there was a chance that he could be selected for termination, and that was enough for him. Hoy Dep. at 121–23. He said he could not afford to be without a job for any length of time because he had just moved to the area and bought a house. *Id.* Each of us must face difficult choices every day, some of which force us to choose the "lesser of two evils." That the benefits of one choice "overwhelm the recipient and dictate the choice cannot be dispositive" on the issue of voluntariness. *Henn,* 819 F.2d at 826. "The question 'Would you prefer $100,000 to $50,000?' will elicit the same answer from everyone, but it does not on that account produce an 'involuntary' response." *Id.* The plaintiffs subjectively evaluated their options and chose the path that appeared to be the best for them. They cannot now hold their employer liable for their own decisions. The ADEA is not intended to serve such a purpose. The motion for summary judgment on all of the claims of these plaintiffs should be **GRANTED.**

### III. PLAINTIFFS' OBJECTION TO MAGISTRATE'S ENTRY

On December 22, 1995, Magistrate Judge Shields ruled on the plaintiffs' motion and supplemental motion for leave file an amendment to the complaint, in which they sought to add as opt-in plaintiffs, three upper-level managers from Indiana Bell. These managers included Bruce Blair, Charles Steinmetz and Raymond Winkler, all of whom were terminated on or about September 16, 1992, and were named in a letter from attorney Mark Waterfill dated October 22, 1992. In her entry, the Magistrate quoted extensively from that letter, in which these potential plaintiffs, by counsel, threatened to file charges with the EEOC and ultimately sue Indiana Bell for age discrimination, if their settlement demands were not met by October 27, 1992.

As noted in the Magistrate's entry, Indiana Bell agreed to a settlement with these plaintiffs, by which they received additional consideration in exchange for their signatures on a "Settlement and General Release." December 22, 1995, Entry at 5. She also carefully considered whether that release should be deemed ineffective under 29 U.S.C. § 626(f), and found that it should not. For all of the reasons given in the Magistrate's entry, this Court fully concurs with her resolution of the plaintiffs' motion to amend the complaint. Thus, the plaintiffs' January 12, 1996, Objection to Magistrate Judge's Ruling on Plaintiffs' Motion to File Amended Complaint is **OVERRULED.**

### IV. CONCLUSION

To summarize, the Court has addressed the defendant's pending motions to strike the reports and testimony of plaintiffs' potential expert witnesses, Michael Murphy, Richard Wertheimer, Marc Bendick, Lance Seberhagen, and Jeffrey Rasmussen. The Court has found that the assumptions, methodology, and conclusions proffered by these proposed experts cannot survive analysis under *Daubert,* or under Rule 403 of the Federal Rules of Evidence. Thus, their testimony cannot form the foundation on which the plaintiffs build their theory of recovery under the ADEA. The defendant's motions to strike all of the experts' reports, opinions and testimony is hereby **GRANTED.**

Also pending was a motion by Indiana Bell seeking summary judgment on the plaintiffs' class pattern or practice claims of age discrimination. After finding the plaintiffs' evidence insufficient to show that unlawful discrimination was Indiana Bell's standard operating procedure, or that it had a general policy of discrimination, or that a significant number of specific instances of discrimination occurred, the Court decided the motion should be granted. Specifically, the Court found that none of the evidence provided by the plaintiffs is sufficient to raise a genuine issue of material fact about whether Indiana Bell engaged in a pattern or practice of making employment decisions based on age, or age related stereotypes. Indiana Bell's motion for summary judgment on the ADEA pattern or practice claims is therefore **GRANTED.**

The final two motions address the individual claims of discriminatory discharge and discriminatory demotions. With respect to the discharge claims, the Court assumed, without finding, that the plaintiffs met all the elements of a prima facie case, and then found that Indiana Bell succeeded in offering a non-discriminatory reason for its decisions. Consequently, the motion was analyzed primarily by considering all of the evidence proffered on the issue of pretext. The plaintiffs did not have enough evidence to create a genuine issue of material fact, and the Court has decided that this motion should be, and here by is **GRANTED.**

However, the motion challenging the demotion claims successfully pointed out that the plaintiffs failed to provide sufficient evidence showing they had met the elements of a prima facie case. Specifically, they failed to show that they suffered an adverse employment action, or that the action was taken because of their age. With no factual issue for trial on this set of claims, Indiana Bell's motion for summary judgment on the demotion claims should likewise be **GRANTED.**

A thorough review of this entire file reveals that all of the claims brought by plaintiffs Jerry Asbrock, Ronald Mote, Sheryl Neal, Janet Webb, and Edward Hollingsworth were dismissed on or about August 4, 1994. Those of plaintiffs Cheryl Wilkinson and Clarence Young were dismissed on October 14, 1994. Final judgment should be entered in favor of Indiana Bell and against these plaintiffs.

The remaining plaintiffs have pursued the claims alleged in the complaint in this action, which was brought in eight counts, as follows:

Count I    ADEA Disparate Impact Claims;

Count II    ADEA Disparate Treatment Claims;

Count III    ADEA Unlawful Demotion Claims;

Count IV    Invalidity of the Waiver;

Count V    Pension–Eligible ERISA Violations;

Count VI    Discriminatory Termination of ERISA Benefits;

Count VII    State Law Wage Claims; and

Count VIII Trade Defamation.

The summary judgment motions at issue have resolved all of the ADEA and ERISA claims, with respect to all of the remaining plaintiffs, found in Counts II and III. Those counts are **DISMISSED with prejudice,** and plaintiffs shall take nothing by way of their complaint. Likewise, in an order dated February 7, 1996, subsequently vacated and amended on April 1, 1998, the Court **DISMISSED with prejudice** all of the claims in Count I, the disparate impact theory of recovery under the ADEA.

Count IV, in which the plaintiffs alleged that the waiver release packages they were given upon termination of their employment contained false and fraudulent information, and that they did not comply with the requirements for such releases under the ADEA, is also dismissed. By order dated May 18, 1994, the Court ruled that Indiana Bell was entitled to summary judgment on the claims of the twenty-one plaintiffs who signed these releases with respect to all of the claims they brought against the defendant, except their ADEA claims. Summary judgment was granted in favor of the plaintiffs with respect to the validity of the waivers for the age discrimination claims. These rulings adequately disposed of Count IV.

The plaintiffs also brought claims under §§ 502, 503, and 510 of ERISA, regarding the amount of benefits they received and the defendant's motivation for selecting them for termination. In its order dated March 19, 1997, the Court granted summary judgment on all of these claims in favor of Indiana Bell and against the plaintiffs. That ruling resolved all of the issues and allegations in Counts V and VI. A motion to reconsider these decisions has been pending, and the Court, by separate order entered this date, denies reconsideration. Counts V and VI are **DISMISSED with prejudice.**

In Count VII, twelve of the named plaintiffs brought claims against Indiana Bell concerning the timeliness and amount of bonuses, vacation pay, and other earned wages they were paid upon termination. In its

order dated January 15, 1997, the Court found that genuine issues of material fact existed concerning the timeliness claims of plaintiffs Bostrom, Hancock, Hedberg, Jones and Wilson. The summary judgment motion was denied as it related to those plaintiffs, but it was granted as to all remaining plaintiffs. In a subsequent order, reconsidering this ruling, the Court vacated the summary judgment ruling as to plaintiff Meyers, and affirmed its ruling as to all other plaintiffs. *See* Order of January 30, 1997. Those claims have since been dismissed as a result of Indiana Bell's offer of judgment under Fed. R.Civ.P. 68, which offer was accepted by these plaintiffs on their claim that they did not receive their vacation pay in a timely manner. Judgment was entered accordingly on April 23, 1997. Judgment should be entered in favor of Indiana Bell and against the other plaintiffs on this count.

Count VIII of the complaint alleges that the defendant defamed the plaintiffs by statements made by its company officials during the course of the resizing. That count was dismissed in its entirety by order dated October 17, 1996. Judgment should be entered in favor of the defendant and against all plaintiffs on this count.

All that remains in this case is Count 1 of the counterclaim filed by defendant, Indiana Bell, on January 11, 1994, claiming that certain of the plaintiffs have breached an agreement not to sue. According to Indiana Bell, the plaintiffs signed the agreement at the time of their termination in exchange for additional compensation. In it they promised not to sue Indiana Bell regarding their employment or terminations, in exchange for that consideration. Indiana Bell seeks damages for these alleged breaches, in an amount that compensates it for the harm it has suffered as a result, including, but not limited to attorney's fees and costs incurred in defending against the claims brought by the plaintiffs.

However, in an order dated December 21, 1994, the Court dismissed the portion of the counterclaim seeking attorney's fees as a measure of Indiana Bell's damages, but denied the plaintiffs' motion to dismiss the remainder of the counterclaim. Therefore, the defendant's counterclaim, as amended on December 21, 1994, remains pending in this action.

In order to facilitate a prompt resolution of the remaining issues in this action, the Court now orders the parties to appear by counsel in Room 204, United States District Courthouse, 46 East Ohio Street, Indianapolis, Indiana, for a **Status Conference** on the 5th of May, 1998, at 4:00 p.m.